**Tom FOX, Darl (Hunk) Havens, Tom York, Barry R. Perry, Gary P. Kapp, Appellants (Defendants below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

**No. 2–376A109.**

Court of Appeals of Indiana, Second District.

Jan. 30, 1979.

Rehearing Denied March 5, 1979.

**1160**

Patrick N. Ryan, Jack B. Welchons, Ryan & Welchons, Marion, for appellant Tom Fox.

Harriette Bailey Conn, Public Defender, David P. Freund, Bobby J. Small, Deputy Public Defenders, Indianapolis, for appellants Havens, York and Perry.

Thomas A. Swihart, Bowman, Crowell & Swihart, Fort Wayne, for appellant Gary P. Kapp.

Theodore L. Sendak, Atty. Gen., John P. Avery, Deputy Atty. Gen., Indianapolis, for appellee.

SHIELDS, Judge.

Appellants were tried by a jury and convicted of first degree arson. I.C.1971, 35–16–1–1 (Burns Code Ed.). Because we find the evidence insufficient to support the convictions of Fox, Havens, York, and Perry, and that reversible error was committed as to Kapp, we will discuss only those issues necessary to the disposition of this appeal or likely to appear upon Kapp's retrial.

I

We consider first appellants' argument that the burned building was not "part or parcel of a dwelling house."

The statute under which appellants were charged and convicted is I.C. 35–16–1–1, which provides, in pertinent part:

> Any person who wilfully and maliciously sets fire to or burns or causes the setting of fire to or burning of . . . any kitchen, shop, barn, stable, garage or other outhouse, or other building that is part or parcel of any dwelling house . . . .[1]

Although no Indiana case has defined the phrase "part or parcel of any dwelling house,"[2] many other jurisdictions have done

---

1. This portion of I.C. 35–16–1–1 is substantially a codification of the common law definition of arson. At common law, arson was the willful and malicious burning of another's dwelling house, or of an outhouse within its curtilage.

See, 6A C.J.S. Arson § 2 (1975); 5 Am.Jur.2d Arson and Related Offenses § 1 (1962).

2. In Abbott v. State (1978), Ind.App., 371 N.E.2d 721, the court, in upholding a conviction of entering to commit a felony held that an

so.[3] At common law, an outhouse which was a "parcel of" a dwelling house was one "used in connection therewith and situated within the curtilage." *Jones v. Commonwealth* (1931), 239 Ky. 110, 38 S.W.2d 971, 973. In *Jones*, the court, in construing the Kentucky arson statute (one substantially identical to our own),[4] reversed a conviction of first degree arson in that the building burned, a former dwelling house converted into a crib for fodder and located 250–300 yards from the dwelling house, was held not to be "parcel" of the dwelling house as it was clearly without the "curtilage" of the dwelling house.

■ "Curtilage" has been defined as: ". . . the space of ground adjoining the dwelling house used in connection therewith in the conduct of family affairs and for carrying on domestic purposes, usually including the buildings occupied in connection with the dwelling house. It is the propinquity to a dwelling and the use in connection with it for family purposes which is to be regarded." (emphasis added) *State v. Lee* (1927), 120 Or. 643, 253 P. 533 at 534–535.[5]

As the authorities indicate, it is the proximity to the dwelling and the *use* in connection therewith *for family purposes and the carrying on of domestic employment* that are of major importance in determining whether an area or building is to be considered within the "curtilage" (i. e., part or parcel) of the dwelling house. This comports with the view that first degree arson is an offense against the security of habitation, rather than property. *Jones v. State* (1904), 70 Ohio St. 36, 70 N.E. 952.[6]

■ In the case at bar, the evidence viewed most favorably to the State shows that the burned building was a barn that had been converted into a combination garage-work area-recreation room. The building, located 80 to 100 feet from the dwelling house, was insulated and panelled and housed a furnace, telephone, and stereo. The Mowerys (owners of the property) often kept vehicles in the building, and Mr. Mowery also had a work area in the building. The building had been used on several occasions for parties and the Mowerys' daughter and her friends often used the building to play music and dance.

The usage of the building as an addition to their dwelling house, i. e., "for family purposes and the carrying on of domestic employment," and its proximity to the dwelling house, persuade us that it was within the "curtilage," i. e., that the building burned was "part or parcel" of the Mowery dwelling house.

## II

■ Appellants challenge the sufficiency of the evidence to establish their identity as the perpetrators of the arson at Mowerys' building. When reviewing the sufficiency of the evidence, this Court considers the evidence most favorable to the verdict together with all reasonable inferences which may be drawn from that evidence. If there is substantial evidence of probative value to support each element of the offense, the judgment will be affirmed. *Moore v. State*

attached garage was "part and parcel" of the family dwelling. The court, however, did not discuss or define "part and parcel."

**3.** *See,* 25 C.J.S. *Curtilage,* p. 81–86; 6A C.J.S. *Arson* § 12b.

**4.** I.C. 35–16–1–1 employs the phrase "part or parcel," where the Kentucky statute simply said "parcel."

**5.** *See also, Commonwealth v. Jones, supra,* 38 S.W.2d at 973, wherein the court defined "curtilage" as "a courtyard or the space of ground adjoining the dwelling house necessary and convenient and habitually used for family purposes and the carrying on of domestic employ-

ment. . . ."; and *State v. Bugg* (1903), 66 Kan. 668, 72 P. 236 at 237, wherein the court held, "We think the Legislature used the word 'curtilage' . . . intending that it should include all buildings in close proximity to the dwelling, which are continually used for the carrying on of domestic employment . . ."

**6.** *Accord, Simmons v. State* (1955), 234 Ind. 489 at 502, 129 N.E.2d 121 at 127, where Justice Bobbitt, concurring, stated, "The clear intent of the legislature as evidenced by [the predecessor to I.C. 35–16–1–1] was to protect a man's home or place of habitation."

(1978), Ind., 376 N.E.2d 1129. Furthermore, this Court does not judge the credibility of witnesses nor weigh the evidence. *Bryant v. State* (1978), Ind., 376 N.E.2d 1123.

In the case at bar, the evidence most favorable to the state reveals that the five appellants were seen together from approximately 2:30 to 3:00 A.M. visiting several bars in Marion, Grant County, Indiana and driving a dirty, goldish-green 1968 Oldsmobile, registered to Fox, which reportedly had "extremely loud mufflers." The appellants were imbibing in spirits at the Swing Bar when, somewhere around 3:00 A.M., Marion police officers were called to the bar twice to quell disturbances[7] and, on the later occasion, also to close the bar. On the former occasion the bar was surrounded by police and York was heard to say, "Isn't there some kind of charge against police harassment?" During this first visit Captain Mowery (Mowery), the owner of the property that was burned, "broke up" what appeared to be a verbal confrontation between Fox and another patron. As Fox was walking back to his table he stated, "That's cool, Mowery. That's cool." During the second police visit to the bar, after Mowery announced that the bar was closed, Fox leaned over as he passed Mowery on the way out and said, "I'll see you later, Mowery," following which a verbal exchange of words occurred between Fox and Mowery. About the same time this confrontation occurred, Havens said, "F____ the pigs. We don't have to listen to this s____. Let's get out of here."

While the Swing Bar was being closed, Officer Ellis, enroute back to his squad car, noticed suspicious-looking tools[8] on the rear floor board of Fox's Oldsmobile. Mowery, upon being informed of these tools, ordered the vehicle to be kept under surveillance. Appellants left the Swing Bar and proceeded to the Kewpie Bar. While at the Kewpie Bar, Perry left the table where all five appellants had been sitting, came back a few minutes later and stated, "Everything's okay. They're scattered." Fox then said, "Well, let's go then," telling an inquirer who was asking to go with them, ". . . we are just going to take care of a little business." After departing from the Kewpie Bar, appellants stopped at Stoller's Tavern and purchased a fifth of whiskey and six 6 oz. (sic) bottles of Coca Cola. Appellants were last seen, prior to the fire at Mowery's, parking the Oldsmobile behind a house in Marion at about 3:25 A.M., at which time surveillance of the vehicle was withdrawn. The vehicle was gone when Officer Stevens checked back at 3:50 A.M.

Carol Mowery (wife of Captain Mowery) was awakened by the dog's barking sometime between 3:30 and 4:00 A.M. After hearing a car idling for some time, she went downstairs and looked out the window and saw two people in a car parked by the barn and three others milling about by the barn. Immediately thereafter she saw flames shoot out of the cab of the stake-bed truck parked outside, next to the barn. She then saw the subjects get into the car and drive off. Some minutes later she called the police (testimony revealed that the call was received at 4:12 A.M.) and her brother-in-law, Clifford Mowery, who was a fireman. In a matter of minutes Clifford arrived and went out to the barn with Mrs. Mowery where they discovered that, in addition to the truck being on fire, the floor mat of the Corvette parked inside the barn and a wall and part of the ceiling of the barn were also aflame. Mrs. Mowery could not identify or describe any of the persons she saw except to say that she assumed they were males by the way they were dressed, and that one of them was very tall and large. She described the car she saw parked beside the barn as a dirty, greenish-gold Oldsmobile which had a noisy exhaust.

After the fire, the greenish-gold Oldsmobile was observed driving through Van Buren, Grant County, Indiana, which is located approximately seven miles east of Mowery's

---

7. It appears as though appellants were not involved in either disturbance that occasioned the police visits to the Swing Bar. ·

8. The tools observed were two bolt cutters, a small sledge hammer, a socket wrench handle, and a small flathead screwdriver.

house. Marshal Marley and Officer Campbell pursued the vehicle and stopped it approximately three-fourths of a mile east of Van Buren at about 5:27 A.M. They arrested the occupants of the car, Perry, Kapp, and Havens, on a preliminary charge of arson. The automobile was impounded. Mrs. Mowery later identified it as the car she saw by the barn the morning of the fire when an officer took her to a garage where it was parked with "several cars . . . and some trucks and stuff."

Deputy Sheriff Cook pursued a gold, 1967 Buick through Marion sometime between 4:00 and 4:45 A.M. The Buick was subsequently found to have been stolen from Van Buren sometime earlier that night. Cook identified Fox and York as the individuals who abandoned the vehicle and fled on foot.

Sheriff Ash, while looking around the burned area, found a 7 oz. (sic) coke bottle which smelled as if it had contained whiskey or alcohol. He further observed a bootprint in the snow beside the barn. Kapp's boots were subsequently brought to the scene and an impression of one of them was made in the snow beside this print. Photographs of the bootprint, as well as Kapp's boots, were admitted into evidence and the similarities were pointed out by the Sheriff. There was no evidence as to the presence of any inflammables on the scene. Fireman Mowery testified that in his opinion the fires were not accidental.[9]

Assuming, arguendo, that this evidence is sufficient to prove that appellants were the five individuals Mrs. Mowery observed at the scene, there is still a link missing in the chain of circumstantial evidence which the State has woven around appellants: that is, who were the two individuals Mrs. Mowery observed that remained in the car, and were these two individuals accessories to the commission of the arson? The State has proven that two individuals remained in the car while three other individuals were perpetrating the crime. Thus, in order to sustain the convictions of these two individuals, it must be shown that they were accessories[10] to the arson.

The general rule is that mere presence at the scene of the crime is not sufficient to allow an inference of participation. *Conard v. State* (1977), Ind.App., 369 N.E.2d 1090; *Bond v. State* (1971), 257 Ind. 95, 272 N.E.2d 460. However, we acknowledge that presence, coupled with other circumstances, may be sufficient. Thus, evidence of companionship with one engaged in a crime, a course of conduct before and after the offense, and failure to oppose the crime when imposed with a duty to do so, without active participation in the commission of the crime, are circumstances which may be considered in determining whether aiding and abetting may be inferred. *Cotton v. State* (1965), 247 Ind. 56, 211 N.E.2d 158. However, an inference from such evidence, to be reasonable, must be coupled with evidence of knowledge or evidence from which knowledge may be reasonably inferred, that the criminal conduct is contemplated, in progress or completed.

Thus, the State must show that the ones alleged to aid or abet were aware of and consented to the activity condemned by law, *Mattingly v. State* (1952), 230 Ind. 431, 104 N.E.2d 721; although it need not necessarily prove a pre-conceived plan. *Simmons v. State* (1974), 262 Ind. 300, 315 N.E.2d 368. In the case at bar, there was no evidence that could show the two individuals in the

---

9. The alleged error in the admission of fireman Mowery's testimony is discussed *infra* in VII.

10. IC 1971, 35–1–29–1 (Burns Code Ed.) provides:

*Accessory before the fact.*—Every person who shall aid or abet in the commission of a felony, or who shall counsel, encourage, hire, command, or otherwise procure a felony to be committed, may be charged by indictment, or information, tried and convicted in the same manner as if he were a principal, either before or after the principal offender is charged, indicted or convicted; and, upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal. [Acts 1905, ch. 169, § 224, p. 584; 1974, P.L. 143, § 17, p. 604.]

car had any knowledge that the arson was planned or committed.[11] There was no evidence of their location in the car, or of any motion by them. While the testimony relating to the appellants' activities in the Kewpie Bar might indicate a criminal design in the making, can one infer from this evidence that they were scheming to commit an arson?[12] This may raise a suspicion that appellants may have known of a criminal design to commit an arson, however, mere suspicion that appellants were aware of a criminal design is not enough. *Conard v. State, supra.* The evidence adduced at trial is insufficient to sustain the convictions of the two individuals who were inside the car while the arson was being committed.

■■■■ This leads to a further problem, being the lack of evidence indicating which of the appellants were inside the car. The only evidence indicating which of the appellants were outside the car was Kapp's bootprint[13] found at the scene. The evidence is, therefore, sufficient to sustain Kapp's conviction as a principal. With respect to the other four appellants, however, we must reach a different result. Because there is insufficient evidence to sustain the convictions of the two individuals that were inside

the car, and since there is no evidence indicating who those individuals were, how can we, as an appellate court, pick and choose which of the four remaining appellants were inside that car? The answer is: We cannot.[14] It is fundamental to our system of law that guilt is individual. *Delgado v. United States,* (9th Cir. 1964) 327 F.2d 641, 642. Here, that means there must be sufficient evidence to support a finding, *as to each appellant,* that he was either a principal or an accessory to the arson as charged. The evidence was insufficient in this regard; thus, we are constrained to hold that the evidence was not sufficient to sustain the convictions of Fox, Havens, York, and Perry.[15]

### III

■■■■ Next, we consider Kapp's argument that the evidence is insufficient to establish a willful and malicious burning. Kapp properly cites *Ellis v. State,* (1969) 252 Ind. 472, 250 N.E.2d 364, as authority for the proposition that the law of Indiana presumes that a fire accidentally resulted from some providential cause, rather than from a criminal cause, unless the evidence proves otherwise.[16] We do not agree, however,

11. Nor was there any evidence involving the arrest of appellants to indicate they had knowledge that a crime had been committed. To the contrary, Perry told Mowery, at the arrest site, that he had been asleep in the car and did not know anything.

12. One might just as reasonably infer they were scheming to commit a burglary. Indeed, there was much testimony introduced by the State that indicated one or more of the appellants had committed a break-in in a store in Van Buren at around the same time the arson was being committed.

13. *See, Johnson v. State,* 380 N.E.2d 566 Ind. App. (1978) as to the admissibility of footprint comparisons on the issue of identity.

14. *Accord, Bond v. State, supra.* In *Bond,* the appellant was with two other women when one of them took a dress from a store without paying for it. In that case there was no evidence identifying the appellant with any specific act of taking the property charged; nor was there any evidence that the appellant had any knowledge of the objective or purpose of the trip to the store. In reversing the appellant's

theft conviction, Chief Justice Arterburn stated:

"From the evidence here no one can determine which of the three women took the coat or dress found missing although circumstantial evidence points to one of the three but *the triers of fact have no right to pick one out of the group and hold such person guilty without some specific evidence pointing to the guilt of that particular [person]."* 275 Ind. at 99, 272 N.E.2d at 463. (emphasis added).

15. Due to our disposition of this issue, we will only address *infra* those issues raised by Appellant Kapp.

16. While *Ellis* spoke in terms of the *corpus delicti* of arson, one must not confuse this with the elements of arson. The elements of arson are: (1) The appellant (2) wilfully set fire (3) to a dwelling house. *Hancock v. State,* (1971) 256 Ind. 697, 271 N.E.2d 731. The statute, I.C. 35–16–1–1, uses the terms "wilfully and maliciously." A "willful" setting fire to or burning would be such an act consciously and intentionally, as distinguished from accidentally, in-

that the evidence was insufficient to overcome the State's burden of proving that the fire was not the result of natural causes.

As the Supreme Court noted in *Ellis,* there is rarely direct evidence of the actual lighting of a fire by an arsonist; rather, the evidence of arson is usually circumstantial. Such evidence is often of a negative character; that is, the criminal agency is shown by the absence of circumstances, conditions, and surroundings indicating that the fire resulted from an accidental cause. *State v. Edwards,* (1934) 173 S.C. 161, 175 S.E. 277, 278.

█ In the instant case, three persons were observed milling about a building late at night on property where they had no right to be. Immediately after one individual was observed standing beside it, flames shot out of the stake-bed truck. Furthermore, fires were subsequently discovered in two other separate locations. All this evidence, taken together, supports the inference that the fires were set "wilfully and maliciously."

### IV

Kapp alleges that the trial court erred when it denied his Motion for Discharge, filed pursuant to the provisions of Ind.Rules of Procedure, Criminal Rule 4(C). The record reveals that Kapp was arrested on January 19, 1974, and charged, by information,

with first degree arson on January 22, 1974. The record further reveals that Kapp was released on bail January 23, 1974. The trial was not commenced until March 4, 1975.

C.R. 4(C) was amended, to be effective on February 1, 1974. The pre-amendment version prior to February 1, 1974, provided:

Defendant on recognizance. No person shall be held by recognizance to answer an indictment or affidavit, without trial, for a period embracing more than one year continuously *from the date on which a recognizance was first taken therein;* but he shall be discharged except as provided by subdivision (A) of this rule. (emphasis added).

The amended version of C.R. 4(C) that became effective February 1, 1974 provided that the one year period, at issue herein, began to run "on the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later . . . ." It is Kapp's contention that the amended version of C.R. 4(C) is applicable to the facts of this case.

█ Although no decisions have squarely addressed this precise issue, there have been cases that have refused to give retroactive application to the February 1, 1974 amended version of C.R. 4(A). Those cases have held that the amended version operates *prospectively only,* as of February 1, 1974. See *Gubitz v. State,* (1977) Ind.App., 360 N.E.2d 259; *Hodge v. State,* (1976) 264

---

voluntarily, or negligently done, and implies that the act must be done knowingly and according to a purpose. 5 Am.Jur.2d *Arson and Related Offenses,* § 11, p. 808. A "malicious" burning is an act done with a condition of mind that shows a heart regardless of social duty and bent on mischief, evidencing a design to do an intentional wrongful act toward another without any legal justification or excuse. *Id.* at p. 809. The element of malice may be inferred from the willful act of setting the fire. *Commonwealth v. Lamothe,* (1961) 343 Mass. 417, 179 N.E.2d 245.

Proof of the *corpus delicti* means proof that the specific crime charged has actually been committed by someone. *Simmons v. State,* (1955) 234 Ind. 489 at 492, 129 N.E.2d 121 at 122. The *corpus delicti* of arson consists of: (1) the burning of the property in question, and (2) a criminal agency as a cause of that burning. *Ellis, supra.* The court, in *Williams v.*

*State,* (1930) 90 Ind.App. 667, 169 N.E. 698, commenting on the second element of the *corpus delicti* of arson, stated, " '. . . it must appear that the burning was by the willful act of some person criminally responsible, and not the result of natural or accidental means' " (citations omitted). 90 Ind.App. at 676, 169 N.E. at 701.

As *Riley v. State,* (1976) 265 Ind. 43, 349 N.E.2d 704 pointed out, ". . . every crime may be said to have a 'corpus delicti' which will necessarily be demonstrated in proving the elements of the crime." 265 Ind. at 45, 349 N.E.2d at 706. In the case of first degree arson, proof that the burning was "wilfully and maliciously" will establish "a criminal agency as a cause of that burning." Thus, while the distinction between the *corpus delicti* of the crime and elements of the crime is immaterial in the instant case, it must still be borne in mind that the two concepts are distinct.

Ind. 377, 344 N.E.2d 293; *State ex rel. Young v. Madison Circuit Court,* (1974) 262 Ind. 130, 312 N.E.2d 74. Since the courts have applied the amended version of C.R. 4(A) prospectively only, it would naturally follow that C.R. 4(C) should be applied prospectively only. We therefore hold that the amended version of C.R. 4(C) is to be applied prospectively only and has no application to arrests made or informations filed before February 1, 1974.[17]

■ Applying the pre-amendment version of C.R. 4(C) to the case at bar, it is apparent that Kapp was not brought to trial within one year after the taking of his recognizance. Under the pre-amendment version of C.R. 4(C), however, any delay chargeable to the defendant resulted in the one year period of C.R. 4(C) running *anew,* i. e., commencing on the last day of the delay. *State v. Moss,* (1976) Ind.App., 343 N.E.2d 827; *Moreno v. State,* (1975) Ind. App., 336 N.E.2d 675; *Holt v. State,* (1974) 262 Ind. 334, 316 N.E.2d 362. In the case at bar, the record reveals that Kapp filed a motion for change of venue from the county, which was denied March 11, 1974. This motion resulted in delay chargeable to Kapp. See *State v. Moss, supra.* The one year time period, therefore, began to run *anew* on March 11, 1974. *Gubitz v. State, supra.* Thus, Kapp was timely brought to trial and his Motion for Discharge was properly denied.

### V

■ It is Kapp's contention that when the trial court granted Perry's [18] motion to dismiss the information, no new information was ever filed, and thus he must be discharged. The record, however, reveals that Perry's motion asked the court "that his Motion to Dismiss [the information] be granted, *or in the alternative, an adversarial preliminary hearing be held to determine whether there is probable cause* that the

defendant committed the alleged offense . . . ." (emphasis added). The record further reveals that on June 4, 1974, the trial court made the following entry: "Motion of Perry is sustained and Probable Cause hearing set for June 6, 1974 at 9:30 A.M." As this entry indicates, the trial court did not dismiss the information; rather, it granted Perry's alternative request for relief. We, therefore, find no merit in Kapp's argument.

### VI

■ Kapp argues that the trial court erred when it denied his pretrial motion to suppress evidence seized after his arrest, i. e., the boots he was wearing the morning of the fire. The day before trial the court apparently heard evidence and argument on said motion to suppress but this evidence was not included in the record on appeal. Since there is no transcript of the evidence adduced at the pretrial hearing had on the motion, we cannot review the trial court's denial thereof. It is the duty of the appellant to present an adequate record to this appellate court; we cannot consider an allegation of error when there is nothing in the record to support it. *See, Bobbitt v. State,* (1977) Ind., 361 N.E.2d 1193, 1197; *Schuman v. State,* (1976) 265 Ind. 586, 357 N.E.2d 895, 899.

### VII

Kapp argues that the trial court erred in permitting Clifford Mowery, the brother of Captain Mowery, to testify as an expert witness regarding the incendiary nature of the fire. He alleges that no foundation was laid to qualify fireman Mowery as an expert witness and that the evidence shows he was not qualified to render such an opinion.

■ It is well established that the question as to whether a witness is qualified to testify as an expert lies within the sound discretion of the trial court. *Reid v.*

---

17. Moreover, it would be ludicrous to apply the amended version in the instant case, since the result would be to "trigger" the running of the one year time limit by an arrest made or infor-

mation filed *before* the amended rule was even to take effect.

18. The corrected record reveals that Kapp joined in this motion on June 4, 1974.

*State,* (1978) Ind., 372 N.E.2d 1149; *Niehaus v. State,* (1977) 265 Ind. 655, 359 N.E.2d 513; *Pettit v. State,* (1972) 258 Ind. 409, 281 N.E.2d 807. The trial court's determination will not be set aside unless there has been an abuse of that discretion. *Reid v. State, supra.* In the case at bar, the foundation testimony revealed that fireman Mowery had worked as a fireman for three and one-half years. Subsequently, the trial court, upon objection to fireman Mowery's opinion testimony as to the cause of the fires, stated that "a man who has worked for three and one-half years can qualify as an expert, perhaps not as much an expert as one who has had a great deal of training in the Fire Marshal's office or various places. But that's, that's for the jury to determine how expert he is. I think he does qualify as an expert sufficient to express an opinion on . . . those things." While we do not believe that working as a firefighter necessarily qualifies one to testify as to the cause of the fire, subsequent evidence,[19] disclosed through examination, revealed that fireman Mowery did have some training and experience in the investigation of fires and that it was a part of his duties to render an opinion as to the cause of fires. This evidence supports the trial court's determination that fireman Mowery was qualified to testify as an expert.

## VIII

Finally, we consider Kapp's allegation that the admission of the following testimony of Captain Mowery, recounting an admission York made to Mowery on the day of his arrest, was erroneously admitted:

A  Well, when I came into the detective bureau, I asked, uh, "Why?". And that's all I said was "Why?". And he said he didn't know why. And I had never made any references as to why he did anything. I just said, "Why?". He said, "I don't know why". And, in the conversation, he admitted that he was there, but refused to give me a statement to that effect.

Q  All right. You say he wouldn't give you a signed statement?

A  That's correct.

Q  Okay. But he did admit being present at your home?

A  The morning of the fire.

Q  Okay.

Kapp objected to and moved to strike the testimony because it was hearsay and then moved for a severance. He further objected to the testimony because the State had made no mention of such a statement in its response to a discovery order which included a request for " . . . the text of any oral statement or confessions or admissions if the same were made at any time by the defendant."[20] The testimony was admitted, the jury being admonished to consider it only against York inasmuch as it was hearsay as to the other appellants. The motion for severance was overruled. The following day, upon completion of Mowery's testimony, the trial court, upon motion, struck the testimony of Mowery relating to York's admission, stating to the jury:

. . . In response to a motion, at this time, due to the fact that no mention was made of an admission by Mr. York in the statements to the defense counsel, where anything of that kind should have been made, I am going to order you to disregard that statement that was made that Mr. York had said that he did this or confessed in any way. You are to disregard that. It's not to be considered.

---

**19.** Although a proper foundation had not been laid when fireman Mowery's opinion was admitted, this later evidence did establish a proper foundation sufficient to uphold the trial court's prior ruling admitting the evidence. *See, Carpenter v. State,* (1978) Ind.App., 378 N.E.2d 908, 911.

**20.** In light of our disposition of this issue, we will not address Kapp's arguments pertaining to the violation of the discovery order. We do note in passing, however, that the record does indicate the State exhibited bad faith when it failed to disclose the statement to appellants prior to trial. This type of action we cannot condone. *See, Reid v. State, supra,* as to possible sanctions in such cases.

The State takes the position that York's admission was not prejudicial to Kapp because it made no references to anyone and, therefore, only implicated York. Kapp argues, *inter alia,* that the admission of this statement was a violation of the rule stemming from *Bruton v. United States,* (1968) 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. The issue we must resolve in this regard is whether the *Bruton* rule applies to a statement that tends to significantly incriminate a co-defendant even though he is not referred to in the statement.

■ *Bruton* held that, despite instructions to the jury to consider the statement only as against the declarant, admission at a joint trial of a defendant's extrajudicial confession implicating a co-defendant violated the co-defendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.[21] While no Indiana decisions have addressed the specific issue before us, it is our opinion that the *Bruton* rule applies with equal force to all statements that tend significantly to incriminate a co-defendant,

whether or not he is actually named in the statement. The fact that the incrimination amounts to a link in a chain of circumstances rather than a direct accusation cannot dispose of the applicability of the *Bruton* rule. Just as one can be convicted on circumstantial evidence, one can be circumstantially accused.

The dissent is of the opinion that since IC 35–3.1–1–11, *supra,* uses the words "makes reference" and "references . . . effectively deleted," that if there is no reference to the defendants, the statement is admissible. This, however, was not the holding of *Bruton. Bruton* spoke in terms of implicating, not referring. Clearly, one can be implicated without being specifically referred to. Indeed, this has been recognized by our Supreme Court:

"In protecting this right of confrontation, we cannot permit references by logical inference that could not be made directly. Because of the context in which the out-of-court statements are to be used, i. e., in a trial of two or more defendants wherein all are charged with the same offense, it will require more

---

**21.** The Indiana legislature responded to the *Bruton* decision by enacting I.C. 35–3.1–1–11, which provides, in pertinent part:

(b) Whenever two [2] or more defendants have been joined for trial in the same indictment or information and one or more defendants move for a separate trial because another defendant has made an out-of-court statement which makes reference to the moving defendant but is not admissible as evidence against him, the court shall require the prosecutor to elect one [1] of the following courses:

(1) a joint trial at which the statement is not admitted into evidence;

(2) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively deleted; or

(3) granting the moving defendant a separate trial. In all other cases, upon motion of the defendant or the prosecutor, the court shall order· a separate trial of defendants whenever the court determines that a separate trial is necessary to protect a defendant's right to a speedy trial or is appropriate to promote a fair determination of the guilt or innocence of a defendant.

(c) When such information would assist the court in ruling on a motion for a separate trial, the court may order the prosecutor to

disclose to the court in camera any statements made by the defendants which the prosecutor intends to introduce in evidence at the trial. [IC 1971, 35–3.1–1–11, as added by Acts 1973, P.L. 325 § 3, p. 1750.]

I.C. 35–3.1–1–12 governs severance motions and provides:

Motion for severance of crimes and defendants.—

(a) A defendant's motion for severance of crimes or motions for a separate trial must be made before or at the close of all the evidence during trial if based upon the ground not previously known. The right to severance of crimes or separate trial is waived by failure to make the motion at the appropriate time.

(b) If a defendant's pre-trial motion for severance of crimes or motion for a separate trial is overruled, the motion may be renewed on the same grounds before or at the close of all the evidence during trial. The right to severance of crimes or separate trial is waived by failure to renew the motion.

(c) If a defendant's motion for severance of crimes or separate trial is granted during the trial, the granting of the motion shall not bar a subsequent trial of that defendant on the crimes charged. [IC 1971, 35–3.1–1–12, as added by Acts 1973, P.L. 325 § 3, p. 1750.]

than a fig leaf to shield the non-declarants from the declarations of a declaring co-defendant. In consequence, there probably will be but few such statements that are susceptible to effective deletion within the meaning of the statute. Where such effective deletion is not clearly possible, due regard being had for the context in which the statement will be used and the normal inclination of a jury to associate a declarant's co-defendants with pronouns or blanks or other vagaries in the edited version, the state must be left to choose between separate trials or foregoing the use of the coveted statement. In the following cases, the Court held that the redaction was ineffective because of the almost inevitable association of the appellant with the non-testifying declarant, under the circumstances of the case. *United States ex rel. La Belle v. Mancusi,* (1968, CA2 N.Y.) 404 F.2d 690; *Serio v. United States,* (1968) 131 U.S.App.D.C. 38, 401 F.2d 989." *Carter v. State,* (1977) Ind., 361 N.E.2d 145 at 148.

As this statement from *Carter* recognizes, in certain instances a co-defendant will be implicated even though the references to him have been deleted. Similarly, one can be implicated by a confession that does not refer to him.

■ The very nature of the State's proof at trial in the case at bar indicates the substantial likelihood that the admission of York's statement would prejudice the other appellants. Since the eyewitness identification evidence was tenuous, the identity of the appellants as the perpetrators of the arson was sought to be established circumstantially by evidence of their companionship before and after the fire. Indeed, the bulk of the voluminous transcript of the evidence in this case is comprised of testimony relating to the appellants being together before and after the fire. When the State has shown, as in the case at bar, that the appellants were together before and after the crime was committed, and a statement of one of the appellants is admitting saying, "I was there," it seems beyond question that this statement is just as prejudicial as a statement saying, "They were there." We simply cannot say that the inability of the other appellants to cross-examine York was an insignificant deprivation of their constitutional right to confront and cross-examine adverse witnesses; particularly where, as here, the co-defendants had no advance notice of such statement. As stated in *Carter, supra,* at p. 148, "In protecting the right of confrontation, we cannot permit references by logical inference that could not be made directly."

■ One further question that must be resolved is whether the admonishment to the jury to disregard York's admission effectively cured the error in admitting the statement. We think not. As Justice Powell stated in *Chaffin v. Stynchcombe,* (1973) 412 U.S. 17, at 41, 93 S.Ct. 1977, at 1990, 36 L.Ed.2d 714:

" . . . it is quite unrealistic to believe that instructions to disregard evidence that a jury might treat in a manner highly prejudicial to a defendant will often be followed." See also *Bruton v. United States, supra* 391 U.S. at 123, 88 S.Ct. 1620, 20 L.Ed.2d 476; *Sims v. State,* (1977) Ind., 358 N.E.2d 746 at 748.

Thus, where the evidence, as here, was entirely circumstantial, York's admission, as evidence of appellants' presence at the scene of the crime, cannot be said to be harmless, even though later stricken from the record. Because of this error, we are compelled to reverse Kapp's conviction and order a new trial.

The judgment of the trial court is reversed and remanded with instructions to discharge Fox, Havens, York, and Perry and to order a new trial for Kapp.

MILLER, J., concurs with opinion.

BUCHANAN, C. J., dissents with opinion.

MILLER, Judge, concurring.

I concur in the conclusions reached by Judge Shields, including her conclusion that the State failed to show that the two persons allegedly in the car at the scene of the crime participated in the crime charged.

Further, it is apparent from the record in this case that essential to the convictions of four of the Defendants, namely, Fox, Havens, York and Perry, if such convictions could be sustained at all, was establishment of the fact that *five* persons were present at the scene of the arson. The evidence revealed that the five Defendants were together earlier in the evening and shortly before the crime although their earlier association was not shown to have been criminal in nature. There was only one witness to the fact that *five* persons were present at the time of the arson. Mrs. Mowery, who occupied the victimized premises with her husband Ronald Mowery, Deputy Chief, Marion Police Department, testified on direct examination that she saw three people in her yard and two in a car. However, on cross-examination, Mrs. Mowery acknowledged that *the day after the arson,* in the presence of a police investigator and the assistant police chief, she dictated a statement which accurately reflected the events of the preceding evening as she then remembered them. The statement was reduced to writing and signed by Mrs. Mowery. In her statement Mrs. Mowery indicated that she saw only *three* people the night of the arson. Mrs. Mowery's testimony that there were *five* persons present was revealed for the first time at trial, more than 13 months after the arson was committed.

I recognize that it is the jury's function, not that of a court on appeal, to weigh the evidence. Still, there is precedent for an appellate court to examine the testimony of a single eyewitness in order to determine if it is so incredible, vacillating, contradictory, weak, improbable or uncertain that it would not be "substantial evidence of probative value from which a jury could reasonably find or infer the existence of each material element beyond a reasonable doubt". *Bryant v. State* (1978), Ind., 376 N.E.2d

1123, 1126; *Wims v. State* (1977), Ind., 370 N.E.2d 358; *Vuncannon v. State* (1970), 254 Ind. 206, 258 N.E.2d 639; *Gaddis v. State* (1969), 253 Ind. 73, 251 N.E.2d 658; *Penn v. State* (1957), 237 Ind. 374, 146 N.E.2d 240. If the evidence had not otherwise been insufficient in this case, I feel this Court would have been compelled to scrutinize the testimony of Mrs. Mowery in order to determine if it was sufficient to support a finding of guilty against Defendants Fox, Havens, York and Perry.[1]

BUCHANAN, Chief Judge, dissenting.

Unlike the majority I would affirm the judgment convicting all the defendants, for two reasons (grounds): First, there was sufficient evidence to sustain the convictions of the five defendants. Second, the *Bruton* rule should not be extended to exclude from evidence defendant York's out-of-court statement at the joint trial.

### GROUND ONE

In my opinion there was sufficient evidence to establish the guilt of Fox, Havens, York and Perry . . . as well as Kapp.

In considering the sufficiency of the evidence, it is convenient to divide the discussion into two parts:
A) Were the defendants present at the scene of the arson?
B) If so, were there sufficient other circumstances in addition to their presence to support a guilty verdict for the crime of arson for all five defendants?

### A.

Bearing in mind that this court considers only the evidence and reasonable inferences therefrom most favorable to the State, I conclude there was sufficient evidence of the presence of the defendants at the scene of the crime.

---

1. It appears from the record in this case that two of the most damaging pieces of evidence, that is, Mrs. Mowery's testimony that there were *five* not *three* persons present at the scene of the crime and the testimony of her husband Capt. Mowery that Defendant York admitted being present at the scene of the arson, both "surfaced" at the trial for the first time, more than a year after the arson. Capt. Mowery's revelation of the "admission" of York was stricken by the trial judge.

The five defendants had been together throughout the early morning hours. They were together at the Swing Bar at the time of two initial confrontations with Officer Mowery. Following the closing of the Swing Bar, the five went together to the nearby Kewpie Bar, where they remained for a short time, then left as a group. They purchased a fifth of whiskey and six small bottles of Coca Cola.

The defendants were seen traveling in the early morning hours in a greenish-gold Oldsmobile with a loud muffler registered to defendant Fox. Marion police surveillance observed the five defendants in the Oldsmobile at 3:30 a. m., less than one hour before the occurrence of the crime at the Mowery residence.

The greenish-gold Oldsmobile owned by Fox was identified by Mrs. Mowery as the car she saw outside her house at the time the fire started. She testified that two people were inside the car and three others were in the area of the barn. When the fire started, those three ran to the car which was then driven away.

Kapp's boot print was found in the snow near the barn. A small Coca Cola bottle which smelled of whiskey or alcohol was found in the same area.

This evidence is more than sufficient to support the inference that the five people at the scene in Fox's greenish-gold Oldsmobile were the same five people who had been spending the early morning hours together and had just a short time earlier been seen traveling together in that automobile, i. e., the five defendants.

### B.

Having found more than sufficient evidence to locate the five defendants on Mowery's premises, I can with like ease find more than sufficient evidence that all five persons at the scene were guilty of arson.

It is at this point that the majority opinion discovers "a link missing in the chain of circumstantial evidence which the State has woven around appellants."

Their analysis is there was insufficient evidence to convict the two persons remaining in the Oldsmobile of being accessories to the arson and as there was no evidence as to which two of the four defendants were inside the car (defendant Kapp being placed at the barn by the presence of a matching boot print), the jury could not separate the guilty from the innocent.

I see no need to separate sheep from goats. The reasonable is that they acted in concert throughout the night in question. The act of one was the act of all. The driver of the get-away car waiting at the curb is just as guilty of murder as the gang member inside the bank who fires the shot that kills a teller as he escapes with the loot. This principle of criminal law is hoary with age.

So it is immaterial as to which defendants remained in the car and which took an active part in the arson at the barn. Acting jointly, they may all be convicted as principals of the crime of arson.[1] *Tessely v. State* (1978), Ind., 370 N.E.2d 907; *Goodlow v. State* (1973), 260 Ind. 552, 297 N.E.2d 803. The hand that lit the fire was the hand of all.

In effect the majority treat this case as a mere present-at-the-scene case. But this is not so. Here there exists a series of circumstances which show not only that these defendants were present acting in concert but there were *other circumstances* tending to show participation. *See McGill v. State* (1969), 252 Ind. 293, 247 N.E.2d 514. Such other circumstances were described by our Supreme Court in *Cotton v. State* (1965), 247 Ind. 56, 211 N.E.2d 158:

1. Ind.Code 35–1–29–1 (repealed effective October 1, 1977) states:

   *Accessory before the fact.*—Every person who shall aid or abet in the commission of a felony, or who shall counsel, encourage, hire, command, or otherwise procure a felony to be committed, may be charged by indictment, or information, tried and convicted in the same manner as if he were a principal, either before or after the principal offender is charged, indicted or convicted; and, upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal.

[T]he trier of facts may consider such presence in connection with other circumstances in determining the guilt of the party involved. *Even if there were no active participation* in the commission of the crime, *failure to oppose it at the time, companionship with another engaged therein, and a course of conduct before* and after the offense are such circumstances as may be considered in determining whether aiding or abetting may be inferred (emphasis supplied).

247 Ind. at 61–62, 211 N.E.2d at 161.

This statement has been consistently reaffirmed. *See Simmons v. State* (1974), 262 Ind. 300, 315 N.E.2d 368; *Young v. State* (1978), Ind.App., 373 N.E.2d 1108; *Lay v. State* (1975), Ind.App., 329 N.E.2d 650.

Those Indiana cases which have reversed convictions because of lack of other circumstances in addition to presence are distinguishable from the present case.

In *Pace v. State* (1967), 248 Ind. 146, 224 N.E.2d 312, the defendant was driving his car from South Bend to LaPorte. His passengers were his wife, two infant children, and Eugene Rootes who was riding in the back seat. The defendant, after receiving permission from his wife, picked up a hitchhiker who sat next to Rootes in the back seat. During the trip, Rootes pulled a knife and took the hitchhiker's wallet. When the hitchhiker later left the car Rootes also took his watch. The defendant said nothing during this drive and continued to drive to LaPorte.

In reversing the defendant's robbery conviction, Justice Hunter found no affirmative conduct from which the jury could draw the inference that the defendant had aided in the crime. He may have known that the crime was being committed. But his failure to oppose it was not sufficient to sustain a conviction since the situation did not impose such a duty on him.

The conviction of the "innocent driver" was likewise reversed in *Lipscomb v. State* (1970), 254 Ind. 642, 261 N.E.2d 860, a case in which the passenger in the defendant's auto robbed a filling station attendant out of the sight and hearing range of the defendant driver seated in the car. Lipscomb paid for the gas and cigarettes he purchased, and the car drove away in a normal manner. When apprehended twelve blocks away Lipscomb had no money on his person, the passenger had $27.00, and there was no evidence that Lipscomb knew of the robbery when arrested.

*Bond v. State* (1971), 257 Ind. 95, 272 N.E.2d 460 presents a situation similar to the *majority's characterization* of this case. In that theft case, a specific dress was present in a store before three women entered. When the women entered, they went to different parts of the store looking at merchandise, but did not purchase anything. After they left, the dress was missing. The Supreme Court held that while there was sufficient evidence that one of the three women took the dress, there were no circumstances other than mere presence which connected more than one woman with the dress's disappearance. Since the jury did not have the right to pick one out of a group and hold that person guilty without some specific evidence pointing to that person, the conviction was reversed.

*Pruitt v. State* (1975), Ind.App., 333 N.E.2d 874, involved passive passengers and a culpable driver. The three defendants traveled in a pick-up truck from Indiana to Sedalia, Missouri, for a rock concert. On the return trip the driver, Pruitt, parked the truck near a gasoline storage tank adjacent to a farm house in Putnam County, removed the lock from a tank and filled a gas can while the other defendants remained in the truck. In reversing the convictions of the passenger defendants Judge Lowdermilk noted that mere presence and negative acquiescence is not sufficient evidence to sustain a finding of guilt. There was no affirmative conduct on their part.

In *Conard v. State* (1977), Ind.App., 369 N.E.2d 1090, two men entered a grocery in Hammond, selected several items and took them to the counter. Instead of paying, however, the clerk was given a hold-up note with which she complied. The men then exited the store unhurriedly, carrying their

groceries, and entered a car driven by the defendant, Conard. The car was driven away at a normal rate of speed.

In reversing Conard's conviction, Judge Hoffman found no evidence connecting the defendant with the crime other than his presence. Conard was not in a position to observe the in-store actions of the robbers; the robbers exited the store at a normal pace carrying a sack of groceries; and Conard drove away unhurriedly.

The mold of the cases just described, three of which are relied on by the majority, does not fit the facts before us. Here there were *sufficient other circumstances* from which the guilt of all five defendants can be inferred.

In each of the described cases, there was a complete lack of evidence as to any concert of action prior to the commission of the crime. Here all five defendants were present at the Swing Bar during the initial confrontations with Officer Mowery. As the bar was being closed, defendant Fox, in the presence of the other defendants, stated "I'll see you later, Mowery." This statement was heard by other persons in the bar. All five defendants then went to the Kewpie Bar, a short distance away. At the Kewpie Bar, all the defendants sat at the same table. After being informed by defendant Perry that "Everything's okay. They're scattered," the five started to leave. The group refused to answer several inquiries as to where they were going. An unidentified person requested to go with the five defendants, but was not allowed to accompany them, being told by Fox, "We are just going to take care of a little business." Coca Cola and whiskey was purchased by the five defendants and a coke bottle smelling of alcohol was found by Mowery's barn.

So there was a course of conduct of joint action by this select group of companions before the offense was committed—a circumstance which can be taken into account in determining guilt, *Cotton v. State, supra.*

Another circumstance was "failure to oppose" the commission of the arson by those remaining in the car. *Cotton v. State, supra.* Recognizing that mere presence and failure to oppose the commission of a crime may not be sufficient standing alone to support a conviction,[2] the courts of this state have consistently listed failure to oppose a crime as a circumstance which can be considered, along with other circumstances, in determining guilt.[3] *Cotton v. State, supra; Mobley v. State* (1949), 227 Ind. 335, 85 N.E.2d 489; *Young v. State, supra; Bigbee v. State* (1977), Ind.App., 364 N.E.2d 149.

The evidence also reveals "companionship" over the entire period in question, an exclusive group which was not open to others.

The final circumstance pointing to the guilt of the parties is the time and place of the occurrence. In each case in which convictions were reversed, the defendant not only had a right to be where he was, but his presence did not lend itself to an inference of suspicious or improper action.[4]

In the present case, however, the time and location of the incident leads to an

---

2. Such evidence may be sufficient, by itself, only where there is a duty on the defendant to oppose the crime. *See Mobley v. State, supra; Pace v. State, supra.* This protects the innocent bystander who witnesses a crime but yet does not intervene in an effort to prevent it. See R. Perkins, Criminal Law (1969 2d Ed.) at 661. Such was the case in *Pace v. State, supra.*

3. Indeed one noted treatise states: "When the bystander is a friend of the perpetrator, and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement." 1 R. Anderson, Wharton's Criminal Law & Procedure (1957) § 108.

4. In *Pace* the defendant was transporting his family and another man to LaPorte. The defendant in *Lipscomb v. State, supra,* drove his car into a service station open for business and purchased gas and cigarettes. Likewise the three women in *Bond v. State, supra,* were conducting themselves within the normal course of activity in a retail store open for business. The innocent passengers in *Pruitt v. State, supra,* were riding in a truck returning home from a long trip. In *Conard v. State, supra,* the defendant was parked outside a grocery store open for business.

inference of suspicious or wrongful activity. *See Carter v. State* (1976), 265 Ind. 535, 356 N.E.2d 220; *Lisenko v. State* (1976), 265 Ind. 488, 355 N.E.2d 841; *Sleck v. State* (1977), Ind.App., 369 N.E.2d 963. The defendants had gone to a stranger's house, uninvited, in the dark early morning hours. The residents were either away or asleep.

It should be added that in addition to the events at the Swing Bar and Kewpie Bar (recited above), the five defendants were observed by Marion police traveling in Fox's greenish-gold Oldsmobile a short time before the fire at the Mowery residence.

In sum, the defendants' collective presence at the scene of the crime, their companionship, their course of joint conduct prior to the crime, the failure of the two persons remaining in the car to oppose the crime, and the time and circumstances under which they made their visit to the Mowery residence present ample evidence from which a reasonable inference could be drawn that all five defendants had knowledge of and either encouraged or participated in the commission of arson.[5]

### GROUND TWO

I further dissent from the majority's extension of the *Bruton* rule to hold inadmissible Captain Mowery's testimony as to defendant York's out-of-court statement.

York's statement (as testified to by Mowery) was not one in which the declaring co-defendant (York) implicated other defendants in acts of wrongdoing. His own actions, not those of any other defendants, were the subject of his statement.

This kind of self-reproach is readily distinguishable from the statement in *Bruton v. United States* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. There, the non-testifying defendant had specifically implicated his co-defendant by name in an out-of-court statement. In the decade since *Bruton* was decided, the United States Supreme Court has not extended this rule to

require the exclusion of a defendant's admission which relates solely to his own participation in a crime, without referring to participation in the crime by any other named or unnamed persons. Without such a United States Supreme Court mandate, I would not extend the *Bruton* principle to the present situation.

This position is strengthened by the clear inference in Indiana statutory and case law that a non-testifying co-defendant's admission which does not refer to any co-defendants is admissible at a joint trial.

Ind.Code 35–3.1–1–11 states:

(b) Whenever two (2) or more defendants have been joined for trial in the same indictment or information and one (1) or more defendants move for a separate trial because another defendant *has made an out-of-court statement which makes reference to the moving defendant* but is not admissible as evidence against him, the court shall require the prosecutor to elect one of the following courses:

(1) a joint trial at which the statement is not admitted into evidence;

(2) *a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively deleted*; or

(3) granting the moving defendant a separate trial. In all other cases, upon motion of the defendant or the prosecutor, the court shall order a separate trial of defendants whenever the court determines that a separate trial is necessary to protect a defendant's right to a speedy trial or is appropriate to promote a fair determination of the guilt or innocence of a defendant. (emphasis supplied.)

The present case is not one which involves "an out-of-court statement which *makes reference to the moving defendant.*" The statute therefore does not mandate the choice of separate trials or non-admission of the statements.

---

**5.** Just as the majority found that the boot print of defendant Kapp when considered with the other evidence was sufficient to show his participation in the crime, I would find use in the crime of the car registered to Fox, considered with the other evidence, is sufficient for the jury to infer his guilt beyond a reasonable doubt.

It is evident that the statute contemplates admission of such out-of-court statements when "all references to the moving defendant have been effectively deleted." Although what constitutes effective deletion is the subject debate, *see Burnett v. State* (1978), Ind., 377 N.E.2d 1340; *Rogers v. State* (1978), Ind., 375 N.E.2d 1089; *Carter v. State* (1977), Ind., 361 N.E.2d 145, *cert. denied,* 434 U.S. 866, 98 S.Ct. 202, 54 L.Ed.2d 142; *Sims v. State* (1976), 265 Ind. 647, 358 N.E.2d 746, when effective deletion is accomplished, the statement is admissible. *See Rogers v. State, supra.*

It follows that if no mention is made of any co-defendants, the statement is admissible. There can be no more effective deletion than omission at the outset . . . which in effect is what happened in this case.

Such a conclusion is consistent with *Rogers v. State, supra,* in which a non-testifying co-defendant's statement was properly admitted because all references to the co-defendants had been effectively deleted.[6]

An even more persuasive argument can be made in this case. As in *Rogers,* the statement is general and is not an attempt to "point the finger at someone else" . . . and, as indicated, there is no reference to any defendant for which a "blank" had to be inserted.

If the statement in *Rogers* was admissible despite the deletion of references to other defendants by the insertion of the word "blank", I fail to see how a statement which makes no reference whatsoever to the existence of other defendants (co-perpetrators) is not admissible.

---

**6.** The deletions were made by inserting blanks in the statement in place of names or numbers of co-defendants. Justice Pivarnik's opinion stated:

> The narrative given by each is a very general account in relation both to the incident and to the involvement of the one giving the statement. There is no indication that the purpose of either Stone's or Williams' statement is to point the finger at someone else or at the other perpetrators. Since the number involved is so large [five], the insertion from time to time of "blank" does not necessarily incriminate anyone.

375 N.E.2d at 1091.