Robert PROHOSKY, Wanda Prohosky, Bruce Summers, Mary Summers, E. Kenneth Mattocks, Marolyn Mattocks, Russell P. Spall, Ardis F. Spall, Ronald M. Prohosky, Elizabeth A. Prohosky, Max I. Stucker, George E. Kanne, R. Joanne Kanne, Merle L. Beaver, Charlene Beaver, Arthur Walker, Cynthia Walker, Edward Prohosky, Pearl Prohosky, Mildred Randolph Young, Candice L. Stetler, M. Sewellyn Cate, J. Tyke Randolph, Amanda E. Zacher, Henry Hubeny, Max E. Stowers, Delos Chuff, Wilma Chuff, Gary Woodke, Karen Woodke, RN, Inc., Edward L. Kosta, Joseph Lane, Estate of Harry E. Brunton, Paul Laird, Wallace Laird, Byron K. Callahan, Charles D. Schleman, Paula J. Schleman, Wayne Gratner, Sandra Gratner, Ray Hammond, Emma K. Hammond, Willie Conley, Sue Conley, Robert G. Chapman, Harold Kanne, Norman Prohosky, Carol L. Prohosky, Gerald Spall, Arthur Brinkman, Anita Evans, Marian B. Williams, Robert C. Laking, Anne Lakin, C.L. Corporation, Thomas L. Kuss, Alma Kuss, C. Mitchell Ockerman, Marcia A. Ockerman, M. Anastasia Stephenson, and Hanes Berenda, Plaintiffs,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.

No. L 82–90.

United States District Court,
N.D. Indiana,
Hammond Division.

March 28, 1984.

**1338**

John R. Nesbitt, Rensselaer, Ind., for plaintiffs.

William M. Evans, Wayne C. Ponader, David R. Day, Linda E. Weaver, Indianapolis, Ind., J. Frederick Hoffman, Lafayette, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

The complaint in this case was filed on October 13, 1982. Jurisdiction is invoked on the basis of diversity of citizenship under 28 U.S.C. § 1332. Plaintiffs are citizens and residents of the State of Indiana, State of Illinois, and the State of Arkansas. Defendant is a corporation organized and existing under the laws of the State of New Jersey, having its principal place of business in New Jersey. The subject matter of the case involves land located in Newton and Jasper Counties, State of Indiana, and in this district.

There has been no certification of class under Rule 23 of the Federal Rules of Civil Procedure although the same was requested. Same was denied. See proceedings December 27, 1982. There has been, subsequent to the filing of the complaint, the intervention of additional plaintiffs. The complaint relates to irrigation activities of real estate previously purchased and now owned by Prudential consisting of approximately 23,000 acres. The complaint seeks injunctive relief as well as money damages.

A trial was held on the injunctive issues in Lafayette, Indiana, beginning on the 24th day of October, 1983 and continued for seven trial days ending November 3, 1983. Final arguments were heard on March 2, 1984. The case is now ripe for decision on the injunctive phase.

### II.

This case is presently before the court on a motion for injunctive relief. Generally speaking, the standards requisite for the granting of injunctive relief are as follows: (1) a reasonable likelihood of prevailing on the merits; (2) an absence of an adequate remedy at law; (3) irreparable harm to the movant that outweighs any harm that might occur to the non-movant should the motion be granted; and, (4) the issuance of the injunction would serve the public interest. *Syntex Ophthalmics, Inc., et al v. Tsuetaki et al*, 701 F.2d 677 (7th Cir.1983); *Machlett Laboratories, Inc. v. Techny Industries, Inc.*, 665 F.2d 795 (7th Cir.1981); *Charles v. Carey*, 627 F.2d 772 (7th Cir. 1980); *Ekanem v. Health & Hospital Corp.*, 589 F.2d 316 (7th Cir.1978); *Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1325 (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978); *Fox Valley Harvestore v. A.O. Smith Harvestore Products, Inc.*, 545 F.2d 1096 (7th Cir.1976); and *Eaton Corporation v. Appliance Valves Corporation*, 526 F.Supp. 1172, 1182 (N.D.Ind. 1981), *aff'd by order* (7th Cir. July 27, 1982).

A district court deciding whether a permanent injunction should issue must undertake a three stage inquiry. First, the court must decide whether plaintiffs have actually succeeded on the merits of their claim. Second, the court must decide whether the "balance of equities" favors the granting of injunctive relief. Finally, the court needs to decide what form the injunctive remedy should take. *Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1057 (E.D.Pa. 1981); *Sierra Club v. Alexander*, 484 F.Supp. 455, 471 (N.D.N.Y.1980), *aff'd*, 633 F.2d 206 (2d Cir.1980).

Particularly when balancing the equities, a district judge should exercise his discretion in determining the propriety of injunctive relief. Among the factors traditionally considered in this balance are: the adequacy of another remedy; the benefit to the plaintiff if injunctive relief is granted and hardship if such relief is denied; the hardship on the defendant if injunctive relief is granted; the hardship on third parties; the convenience and effectiveness of administration; and the public and social consequences of either granting or denying injunctive relief. *Philadelphia Welfare Rights Organization, supra*, 525 F.Supp. at 1058.

### III.

A part of the historical background relating to the purchase of this real estate is found in *Coldwell Banker & Co. v. Karlock*, 686 F.2d 596 (7th Cir.1982).

In this case it is desirable to first consider the substantive law of Indiana, both ancient and modern, both common law and statutory law, in order to fulfill this court's obligation under *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to apply the substantive law of Indiana. See also, *Bank of Waukegan v. Freshley*, 421 F.Supp. 1033 (N.D.Ind.1976). Courts of the United States sitting in diversity jurisdiction cases are required to apply the constitutional, statutory and common law of the state in which they sit whenever faced with a non federal question of law.

*Gintert v. Howard Publications, Inc.*, 565 F.Supp. 829, 837 (N.D.Ind.1983); *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272 (7th Cir.1976); *Seaboard Finance Co. v. Davis*, 276 F.Supp. 507, 513 (N.D.Ill.1967).

In fulfillment of this obligation this court must first carefully examine the common law of Indiana as it has evolved during the last century and a quarter.

In the first Indiana case, *New Albany and Salem Railroad Company v. Peterson*, 14 Ind. 112 (1860), the railroad company, in the course of constructing the railroad, caused ground water to be diverted from plaintiff's well. The Supreme Court of Indiana applied the English Rule of Absolute Ownership to absolve the railroad company from liability, saying:

[W]e think the present case, for the reasons above given, is not to be governed by the law which applies to rivers and flowing streams, but it rather falls within that principle which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil part water; that the person who owns the surface may dig therein, and apply all that is there found to his own purpose, at his free will and pleasure; and that if in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of *damnum absque injuria*, which cannot become the ground of an action.

*Id.* at 114.

The next case to be decided was *City of Greencastle v. Hazelett*, 23 Ind. 186 (1864) in which the Supreme Court of Indiana again applied the English rule to a case when the *quality* of the neighbor's water rather than the *quantity* was adversely affected by the defendant's activities. The plaintiff in *City of Greencastle* alleged that the use of the city's land for burial purposes would destroy the use of the

plaintiff's spring for domestic purposes, but the court concluded that because the city was the owner of the property, the use of that property was for the city to determine. The fact that a cemetery might cause subsurface water to be rendered impure, thereby destroying the use of the spring, would not be a sufficient ground for the granting of a temporary injunction.

The English rule of absolute ownership was again recognized in *Taylor v. Fickas*, 64 Ind. 167 (1878), although *Taylor* was a surface water case, and in *People's Gas Co. v. Tyner*, 131 Ind. 277, 31 N.E. 59 (1891), and *Ohio Oil Co. v. Indiana*, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729 (1900), although *People's Gas* and *Ohio Oil* were gas cases. In *People's Gas*, the court cited with approval the following language:

> Petroleum oil, like subterranean water, is included in the comprehensive idea which the law attaches to the word land, and is a part of the soil in which it is found. Like water, it is not the subject of property except while in actual occupancy, and a grant of either water or oil is not a grant of the soil or of anything for which ejectment will lie.

> \* \* \* \* \* \*

> Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals *ferae naturae*. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner.... They belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of gas. If an adjoining, or even a distant, owner, drills his own land, and taps your gas, so

that it comes into his well and, under his control, it is no longer yours, but his. 131 Ind. 281, 31 N.E. 59.

In 1904, the Supreme Court of Indiana chose not to apply literally the English Rule of Absolute Ownership in *Gagnon v. French Lick Springs Hotel Co.*, 163 Ind. 687, 72 N.E. 849 (1904). In that case Gagnon and others had sunk a well in property located near the French Lick Springs Hotel and had proceeded to pump water from that well. The sole purpose of this action was not to use the water for some purpose beneficial to Gagnon's land, but instead to dry up the natural spring located on the French Lick Hotel premises and thereby force the French Lick Springs Hotel Co. to either take Gagnon and others back into the company or buy them out at a figure agreeable to Gagnon. The water was totally wasted by Gagnon and was not used to further enjoyment of Gagnon's land. The Supreme Court of Indiana upheld the trial court's *temporary* injunction that prevented the pumping by Gagnon.

*Gagnon* found the use of water could be enjoined because it was a *total* waste of water undertaken with the deliberate intent to harm the owners of the French Lick Hotel. The Supreme Court of Indiana summarized the holding of *Gagnon* as follows:

> If the exercise of dominion over water in a subterranean stream dries a nearby spring, *and* results in waste of water *and* inflicts injury without furthering the enjoyment of the interceptor's land, a court may restrain the use.[1]

*Wiggins v. Brazil Coal & Clay Corp.*, 452 N.E.2d 958, 964 (emphasis added)

*Miller v. Black Rock Springs Imp. Co.*, 99 Va. 747, 40 S.E. 27 (1901), a case cited by the Supreme Court of Indiana in *Gagnon*, summarizes the different sources of water:

> In considering the relative rights and obligations of owners of adjoining lands in respect to water passing from the

---

1. Because in *Wiggins* the Supreme Court of Indiana refers to *Gagnon* as a subterranean stream case it may be that *Gagnon* was not governed by the same law as *Wiggins*. At least one commentator has suggested that the riparian law governing surface streams may have been applied in *Gagnon*. Note, "Water Rights in Indiana", 32 Indiana Law Journal 39, 48 (1956–57).

lands of one to those of the other, the subject naturally divide (sic) itself into four branches of inquiry, and this on account of the four different modes in which water may, and sometimes does, pass from one tract to another:

(1) In respect to surface streams, which flow in a permanent, distinct, and well-defined channel from the lands of one owner to those of another.

(2) In respect to surface waters—however originating,—which, without any distinct or well-defined channel, by attraction, gravitation, or otherwise, are shed and pass from the lands of one proprietor to those of another.

(3) Subterranean streams, which flow in a permanent, distinct, and well-defined channel from the lands of one to those of another proprietor.

(4) Subsurface waters, which, without any permanent, distinct, or definite channel, percolating in mere veins, ooze or filter from the lands of one owner to the lands of another.

Id. at 28, citing *Frazier v. Brown*, 12 Ohio St. 294 (1861).

In *Irving Materials, Inc. v. Carmody*, Ind.App., 436 N.E.2d 1163 (1982), neighboring property owners brought suit for damages suffered when their domestic wells went dry a few months after Irving Materials began pumping water out of its gravel pit. The trial court found that Irving Materials' use of its land was reasonable, and denied the injunctive relief sought by the neighboring property owners, but awarded damages to these property owners, reasoning that, in essence, it was only fair for Irving Materials to bear the costs which plaintiffs had incurred in drilling new wells because those costs could be passed on to Irving Materials' customers. *Id.* at 1164, n. 2. The Court of Appeals reversed, stating that since Irving Materials' use of the land was reasonable and, therefore, lawful, there could be no award of damages because there had been no legal wrong:

Here the trial court found that Irving Materials' use of its land to be reasonable and, therefore, lawful. The law

does not award damages where no legal wrong is found. We hold that the trial court's judgment awarding damages is directly opposite the correct conclusion, clearly erroneous, and contrary to law.

\* \* \* \* \* \*

We are not saying the plaintiff-appellees were not damaged, but it is *damnum absque injuria.* They simply have not suffered legal wrong.

*Id.* at 1165

The last and most recent statement of the common law as to ground water extraction and use is found in *Wiggins v. Brazil Coal & Clay Corp.*, Ind.App., 440 N.E.2d 495, 501 (1982), *vacated,* Ind., 452 N.E.2d 958 (1983).

The Supreme Court of Indiana granted transfer and vacated the opinion of the Court of Appeals.

The fact that the Supreme Court of Indiana vacated the decision of the Court of Appeals which attempted to change the law to adopt Section 858 is proof that it decided the issue of the Restatement's relevance to Indiana law. The Court of Appeals determined that the plaintiffs would prevail under the special reasonableness test of Section 858. The Supreme Court, by deciding that, in light of the Indiana cases, the test was one of maliciousness or gratuitousness and that, under this test, the defendant would prevail.

*Wiggins* enunciates the common law of Indiana governing use of ground water by a property owner. In that case, the Supreme Court of Indiana held that a user of ground water is not liable for injury to neighboring property owners caused by such use unless that injury is caused maliciously or gratuitously, the court stating:

We, therefore, conclude that the law governing property in ground water applies in the case on appeal. Ground water is part of the land in which it is present and belongs to the owner of that land. It may be put to use to the fullest extent to further enjoyment of the land, however, this right does not extend to causing

injury gratuitously or maliciously to nearby lands and their owners.

452 N.E.2d 958

Justice Hunter who dissented in *Wiggins* summarized the majority opinion as follows:

> The majority steadfastly clings to the rule that ground water belongs to the owner of the land under which it flows and that it may be used as the owner wishes despite injury to neighboring owners of ground water, unless the injury is caused "gratuitously or maliciously." *Id.* at 965

The Supreme Court of Indiana chose not to define either "maliciously" or "gratuitously". There is nothing in the opinion to indicate, however, that the words are to be given any meanings other than their commonly understood meanings.

In defining "maliciously", *May v. Anderson*, 14 Ind.App. 251, 42 N.E. 946 (1896), an action for slander of title in which the court equated "maliciously" with a deliberate intention to injure:

> If they [certain statements] were made maliciously, they were made with the deliverate intention to injure the appellee, .... If the jury had found that the statements were made with an intent to injure the appellee, it would only have been another form of expressing the fact that the statements were made maliciously. The finding that the statements were made maliciously was finding of a fact, and not a conclusion of law. It was, as we have seen, the equivalent of saying that the statements were made with the deliberate intention to injure the appellee.

*Id.* at 14 Ind.App. 254, 42 N.E. 947

A more recent criminal case, *Fox v. State*, 179 Ind.App. 267, 384 N.E.2d 1159 (1979), reiterates the synonymy of "malicious" and "deliberate intent to injure":

> A "malicious" burning is an act done with a condition of mind that shows a heart regardless of social duty and bent

on mischief, evidencing a design to do an intentional wrongful act toward another *without any legal justification or excuse.*

*Id.* at 179 Ind.App. 276, 384 N.E. 1167, n. 16 (emphasis added)

There appears to be no cases defining "gratuitously" in the context used by the *Wiggins* court.[2] *Webster's Third New International Dictionary* (1971) defines the word as meaning "not called for by the circumstances;" or "adopted or asserted without good ground".

Even though the Supreme Court did not define in precise terms the concept of causing injury "maliciously or gratuitously", it did indicate, by example, uses of ground water that would give rise to liability and uses that would not. These examples are relevant because the language of the court's opinion is to be interpreted in light of the issue decided. *Gerking v. Johnson*, 220 Ind. 501, 507, 44 N.E.2d 90, 92 (1942).

The court found that uses of water which waste the water, inflict injury on neighboring landowners, and do not further the use or enjoyment of the overlying land could be stopped, while injury resulting from use for a beneficial purpose conducted in a proper manner could not be enjoined, the court stating:

> When an owner takes hold of his lands, putting them to his own special uses, and altering them to his own purposes, he necessarily works a change in circumstances, even an injury, upon adjoining and neighboring lands. In recognition of this fact, the property in lost waters is cast and enforced by courts in a manner which recognizes that some of these injuries are the necessary result of proper and legitimate utilization of land while others are not. If the exercise of dominion over water in a subterranean stream dries a nearby spring, and results in waste of water and inflicts injury without furthering the enjoyment of the interceptor's land, the court may restrain the use. [Citing *Gagnon*]. Similar dam-

*Hacker v. Dan Young Chevrolet, Inc.,* 159 Ind. App. 28, 304 N.E.2d 552 (1973).

---

**2.** The word is most frequently used to mean without consideration, *e.g.*, gratuitous bailment,

age to a nearby well resulting from construction being prosecuted in a usual and proper manner could not be stopped. [Citing *New Albany and Salem Railroad*].
*Wiggins v. Brazil Coal & Clay Corp.*, *supra* at 964

■ Thus, in determining the ultimate question of whether use of water has caused injury maliciously or gratuitously, the Supreme Court of Indiana has set forth certain indicia by which the determination may be made. The ultimate question will always remain whether the use of ground water causes injury maliciously or gratuitously but, in answering that question, there are certain factors that a court may examine. These include: (1) whether the water is being used to further the enjoyment of the user's land; (2) whether use of the water is proceeding in a usual and proper manner; or, alternatively, (3) whether water is being wasted.

In examining this common law background in Indiana it is well to keep in mind the admonition of Justice Frankfurter that legal doctrines "derive meaning and content from the circumstances that give rise to them and from the purposes they are designed to serve. To these they are bound as is a live tree to its roots." *Reid v. Covert*, 354 U.S. 1, 50, 77 S.Ct. 1222, 1248, 1 L.Ed.2d 1148 (Frankfurter, J., concurring).

While the 125 year long common law development in regard to ground water in the State of Indiana is both interesting and instructive, none of the cases are in factual setting that are substantially similar to this one. The factual setting of *Wiggins* is substantially different from this one. The factual setting of *Gagnon v. French Lick Springs Hotel Company* while more closely aligned with the facts in this case still involves fundamentally different considerations. For example, in this case there is no argument that Prudential is attempting to deliberately and pervasively with malice extract ground water purely to deprive adjacent landowners of the opportunity to do the same thing. The defendants here place great stock in the majority opinion in *Wiggins* but as will be more apparent in later portions of this opinion, there are a number of factual and legal considerations that were not before that court in that case and which are before this court in this case. The fact that the Supreme Court of Indiana declined to specifically embody the precise principles of Section 858 of the Restatement of Torts into the common law of Indiana in *Wiggins* is neither decisive for Prudential or against these plaintiffs. As will become apparent, there are a number of considerations that are different there from here.

It is also important to understand that at this point in time this court is looking at the substantive law of Indiana in regard to injunctive issues and must emphasize that the claims for damages by the plaintiffs must wait for another day and another trial.

## IV.

It is also important to examine the statutory law of the State of Indiana as it pertains to ground water. Although not directly applicable to the facts of this case, Acts 1951, ch. 29, Sect. 1 et seq. as found in Ind.Code 13–2–2–1 et seq. is a highly important statement by the Indiana General Assembly of legislative purpose now more than three decades old. That statute defined ground water as "all water filling the natural openings under the earth's surface, including all underground streams, artesian basins, reservoirs, lakes and other bodies of water below the earth's surface." In Section 2, as found at Ind.Code § 13–2–2–2, an extremely important statement of legislative policy and intent is found:

> It is hereby declared a public policy of this state in the interest of the economy, health and welfare of the state and its citizens to conserve and protect the ground water resources of the state and for that purpose to provide reasonable regulations for its most beneficial use and disposition.

As a direct but somewhat limited response to the problems that are manifest in

this record in Jasper and Newton Counties the Indiana General Assembly adopted Acts 1982, P.L. 102, Sect. 1 et seq. as found at Ind.Code 13–2–2.5–1, the same which is copied fully in Appendix A hereto. At its next session the Indiana General Assembly adopted P.J. 164–1983, Sect. 1 et seq. as found at Ind.Code 13–2–6.1–1 which is fully set forth in Appendix B hereto. It should be noted in the definition section of the 1983 Act the following provision:

"Beneficial Use" means the use of water for any useful and productive purpose and includes but is not limited to domestic, agricultural (*including irrigation*), industrial, commercial, power generation, energy conservation, public water supply, waste assimilation, navigation, fish and wildlife and recreational uses. (emphasis added).

The same statute also defines reasonable-beneficial use as "the use of water for a beneficial use in such quantity and manner as is necessary for economic and efficient utilization and is both reasonable and consistent with the public interest." The same statute also contains an all encompassing definition of "ground water" as "all water occurring beneath the surface of the ground regardless of location and form." And finally it includes a broad definition of "water resource" including "all water on or beneath the surface of the ground or in the atmosphere including streams, impoundments diffused surface water and water percolating, standing or flowing beneath the surface of the ground, as well as all boundary and coastal waters within the jurisdiction of the state." All the above definitions are found in Ind.Code 13–2–6.1–1.

No one here disputes that all of the wells involved in this case belonging to Prudential are required to be registered under Ind.Code 13–2–2.5–4 and that the same wells are also indisputably included within the definition of "significant water withdrawal facility" as found in the definition section of Ind.Code 13–2–6.1–1. It is correct that some of the administrative regulations and procedures as well as other significant provisions of the 1983 Act will not be in place until July 1, 1984 and the realities of bureaucracy would indicate that it will probably be sometime later than that.

■ There is no doubt that under both the common law and the Acts of 1983 in Indiana the extraction of ground water for purposes of agricultural irrigation constitute an appropriate use thereof. All doubts in regard thereto are laid to rest by the express provisions of the 1983 Act as quoted above.

When one looks at the totality of the common law and the full sweep of the aforesaid enactments by the Indiana General Assembly there is a clearly emerging legislative intent in the State of Indiana to rub off the hard edges of the common law in regard to the absolute right of an owner of land to extract ground water from the area underlying that land for any purpose in an unlimited amount. Given its factual setting, *Wiggins* is only of limited value in deciding this case and in fixing the relative rights of adjacent landowners with regard to the extraction of ground water in massive amounts from beneath closely located tracts of land.

These Indiana statutes are here under consideration at two levels. One, as a possible legal basis for the plaintiffs' claims for injunctive relief. Secondly, as a legal remedy for the damage claims of the plaintiffs that are not here decided but remain to be decided at a future time in this case.

The 1982 Indiana statute (Ind.Code 13–2–2.5–1) was designed to regulate the problem caused by the lowering of the static water levels due to Prudential's and others' high-capacity pumpage in Newton and Jasper Counties. This statute provides that the DNR must shut down high-capacity wells if the effect of the pumpage of those wells is to lower the static water level so that domestic and livestock wells constructed in accordance with certain minimal guidelines established by the DNR are unable to produce their normal supply of water. These guidelines promulgated by DNR were not designed to maximize the amount of water that Prudential could

pump. As Mr. Burns testified, these guidelines were designed by reference to what the DNR considered to be generally accepted standards of well construction in the industry. The adoption of these minimal standards for construction was necessary in order to promote the shared use of the resource contemplated by the General Assembly.

At the height of the irrigation pumpage, the water under all of the plaintiffs' property should remain under artesian conditions and to be reached by adequate equipment.

Three Indiana statutes, Ind.Code §§ 13–2–3–1, 13–2–2.5–1 and 13–2–6.1–1, all address ground water uses. Two of these statutes, Ind.Code §§ 13–2–2–1 and 13–2–6.1–1, discussed supra, speak primarily to permitting the DNR or the natural resources commission to regulate ground water withdrawals which threaten to deplete permanently the water resource in a particular area or aquifer. If Prudential had caused injury maliciously or gratuitously, the failure of the state agencies to act would not insulate Prudential from liability on either damage or injunctive claims.

Ind.Code § 13–2–2.5–1 (the 1982 Jasper and Newton Counties statute) does have relevance here for two reasons. This statute was enacted to address precisely the situation created by Prudential's irrigation. The General Assembly chose not to prohibit Prudential's irrigation but it also did not choose to allow Prudential's irrigation to occur without regard for its effect on water levels in the area. Instead, it chose to balance use of the water resource against protection of domestic or livestock well owners.

The statute restricts Prudential's use of water in that it requires the DNR to shut down Prudential's irrigation wells if the DNR finds that the wells have interfered with a domestic or livestock well constructed in accordance with DNR guidelines. This shut-down of irrigation pumping will occur regardless of whether or not Prudential has caused injury maliciously or gratuitously. Accordingly, it significantly modi-fies the common law as established in *Wiggins.*

Further, the statute establishes a duty on well owners in the area to comply with DNR guidelines. These guidelines are not designed to maximize Prudential's pumpage but instead reflect generally-accepted well construction standards in the area. They recognize that development of the resource will very possibly affect neighboring well owners but refuse to permit those well owners to totally halt use of the resource unless those neighbors first take the prescribed steps to accommodate that use, *i.e.*, construct their wells in accordance with the guidelines.

Finally, the 1983 Indiana statute (Ind. Code 13–2–6.1–1) provides for the continued study of the Indiana water resource with respect to the adequacy of that resource, the uses which are being made of such resource and the desirability or necessity of additional legislation. Under the terms of this statute, the natural resources advisory committee shall report back to the legislature as to the results of the continued studies and continued monitoring of the Indiana water resource. If the committee determines that legislative changes are necessary, it will recommend such changes to the legislature. The Indiana General Assembly will in turn determine whether or not the law with respect to ground water is adequate or whether it needs to be changed.

This court cannot believe that the Supreme Court of Indiana would fail to give full import to the public policy values that are embodied in these three Indiana statutes if a case, such as this one, were presented to that court. This court makes an *Erie* educated guess that in such a factual setting that court would not use *Wiggins* to close the court house door to *all* the injunctive and damage claims of these plaintiffs in this case.

## V.

Plaintiffs in this case are required to produce substantial evidence to prove the

material allegations of their complaint for injunctive relief. *Decatur-Kocher Lumber, Inc. v. Ehrsam*, 136 Ind.App. 397, 399, 201 N.E.2d 568, 569 (1964). Plaintiffs are required to prove each element of their claims. *Cerra v. McClanahan*, 141 Ind. App. 469, 472, 229 N.E.2d 737, 739 (1967).

These general rules apply equally in the case of an injunction. The party seeking an injunction has the burden of showing facts which entitle him to that relief. *Kramer v. Rager*, Ind.App., 441 N.E.2d 700, 705 (1982). As this court noted in *Eaton Corporation v. Appliance Valves Corporation*, 526 F.Supp. 1172, 1182 (N.D. Ind.1981), *aff'd by order* (7th Cir.1982), the plaintiff must prove each of the prerequisites to injunctive relief.

Because plaintiffs have the burden of proof, if the evidence is doubtful, or if the evidence on any issue is evenly balanced, then the finding must be against the plaintiffs. *Great Atlantic & Pacific Tea Co. v. Custin*, 214 Ind. 54, 61–62, 13 N.E.2d 542, 545, *reh. denied*, 214 Ind. 54, 14 N.E.2d 538 (1938).

This court must now turn specifically to some of the claims for injunctive relief and comment on some evidence in regard thereto.

### A.

All of the plaintiffs, save one,[3] are the owners of real estate in Jasper or Newton Counties, Indiana. Almost all of the plaintiffs, except for Gerald Spall[4], Henry Hubeny, Max Stowers, Arthur and Cynthia Walker, Norman and Carol Prohosky and Marian Williams[5], claim that they were without water for varying periods of time due to Prudential's pumping.

In 1982, 21 plaintiffs experienced problems in obtaining water. Of that number, 9 plaintiffs, within usually a period of a few days to a week, modified their water systems and from that time forward experienced no further problems with respect to the availability of water. Twelve plaintiffs who elected to do nothing, along with seven other plaintiffs had problems in 1982. Of those 19 plaintiffs experiencing problems in 1982, 14 plaintiffs elected to take steps to modify their water systems, and they in turn obtained adequate supplies of water again and have had no further problems since that time.

In 1983, six plaintiffs experienced problems in obtaining water. These consisted of five plaintiffs who had experienced previous problems but had not adequately modified their water systems and one person who had not experienced problems before. Of those persons, almost all who made the appropriate modifications to their water systems have experienced no further problems in obtaining water or have alternative sources of water, usually through wells in the surficial aquifer.

The evidence reveals that the pumping lowered the static water level in some wells below the level at which the pumping equipment in those wells could reach the water. Almost all of these persons have modified their wells, or drilled new wells where modification was not possible now have water. Most of these people received some reimbursement from Prudential for their water problems, again in varying amounts. Only six plaintiff families had wells without water during 1983: Wayne and Sandra Gratner, Robert and Aloma Chapman, Thomas and Alma Kuss, Ray

---

**3.** Plaintiffs Charles and Paula Schleman live in Montour Falls, New York. Mrs. Schleman is the daughter of Wanda Prohosky. The Schlemans do not own land in either Jasper or Newton Counties. (Schleman Interrog., Q. 1).

**4.** Gerald Spall had to install a new submersible pump in September 1981 because his old pump burned up but he does not know if this new

pump was needed due to Prudential's irrigation. Spall Dep., 5/8/83, p. 13.

**5.** The Walkers, Norman and Carol Prohosky and Marian Williams all obtain their water from wells in the surficial aquifer. Arthur Walker Dep., 8/24/83, p. 8; Norman Prohosky Dep., 5/17/83, p. 8; Williams Dep., 8/23/83, p. 4.

and Emma Hammond, Joe Lane and Anita Evans.[6]

Some of the plaintiffs, but certainly not all of them, claim that the amount of hydrogen sulfide in the water in the new wells that they drilled, or in the existing wells that they modified, has increased since Prudential began pumping. The following plaintiffs claim more hydrogen sulfide exists in the water of their new wells: Conley, Beaver, Ed Kosta, Russell Spall, and Anastasia Stephenson, although the amount of that increase and the time of year in which it allegedly occurs varies from plaintiff to plaintiff. The plaintiffs, Ockermann, Gerald Spall, Mattocks, Evans, Gratner, Brinkman, Brunton, Stucker, Woodke, Ron Prohosky and Robert Prohosky, believe the hydrogen sulfide levels are worse in their old wells.

Some plaintiffs, but again not all plaintiffs, complain that surface water levels have declined since Prudential commenced pumping. No plaintiff apparently claims that this occurred in 1981; some plaintiffs claim that water levels were diminished in

1982 and in 1983, while others believe water levels declined in 1982 but not in 1983. Still others believe that water levels declined in 1983 but not in 1982.[7]

Some plaintiffs, but not all of them, claim that their crop yields have been damaged as a result of Prudential's irrigation pumpage.[8] Not all plaintiffs raise crops or keep crop yields,[9] however, and not all plaintiffs who raise crops claim that their crops were damaged,[10] but this is a claim of some of the plaintiffs.

This is true even though it is almost impossible to generalize about plaintiffs' claims. See this court's comments at pages 1739–41 T.

**B.**

■ Plaintiffs raised another claim concerning physical damage to the aquifer itself. At the time of their depositions, Geo-Trans' experts could point to no evidence showing that physical damage has occurred.[11] At the trial of this case, how-

6. The Gratners' well had experienced no problems until July 1983. They were without water for three days until they lowered their pump to the bottom of the well. (Gratner Deposition, 8/24/83, p. 4) Chapman encountered problems with his bedrock well in 1981 and 1982 but had not fixed it. In July 1983, he again had problems, but had not installed a deep well jet pump because he was able to use another well on his property. (Chapman Dep., 8/24/83, pp. 4–7) The Kusses had encountered problems in 1981, had installed a new pump and 20 more feet of pipe. They were without water in August 1983 for 3 days. (Kuss Dep. 8/23/83, p. 4) The Hammonds had problems in their shallow bedrock well in both 1981 and 1982 and had drilled a sand well for reserve use. On July 12, 1983, the bedrock well quit producing and they shifted to the sand well. (Hammond Dep., 8/24/83, p. 4) Lane's well could not reach water for the first time in August 1983 so he added an additional 8 feet of pipe to correct the problem. (Lane Dep., 8/24/83, p. 6) Anita Evans' bedrock well, used to wash clothes, quit in 1983 so she used her sand well (Evans Dep., 8/24/83, p. 4)

7. *E.g.*, Gratners say that ditch levels were normal in 1982 but low in 1983. (Gratner Dep., 8/23/83, p. 9) Conley thought ditches were low in 1982. (Conley Dep., 5/23/83, p. 21) Lakin and Wally Laird found ditch levels higher in 1983 than in 1982 but Paul Laird and Brinkman

thought 1983 ditch levels were normal. (Lakin Dep., 8/24/83, p. 6; W. Laird Dep., 8/24/83, p. 7; P. Laird Dep., 8/24/83, p. 9; Brinkman Dep., 3/23/83, p. 9) Norman Prohosky thought 1981 ditch levels were normal but 1982 was low. (N. Prohosky Dep., 5/17/83, p. 43) Wanda Prohosky believes her ditch levels are low because Prudential dams ditches on its property. (W. Prohosky Dep., 12/16/82, p. 34)

8. *E.g.*, Beaver (Dep., 8/23/83, p. 10); Hubeny (Dep., 8/23/83, p. 11); George Kanne (Dep., 8/23/83, p. 14, 19); Wally Laird [corn excellent, beans affected in 1982] (Dep. 8/24/83, p. 23, 33); Robert Prohosky (Dep., 8/23/83, p. 18); Russell Spall (Dep., 8/24/83, p. 26); Max Stucker (Dep., 8/23/83, p. 10)

9. *E.g., no yield information*—Brinkman (Dep., 8/23/83, p. 7); Gratner (Dep., 8/23/83, p. 14); Lane (Dep., 5/23/83, p. 14); *no crops*—Estate of Harry Brunton (Dep., 5/19/83, p. 25); Hammond (Dep., 5/20/83, p. 5); Mattocks (Dep., 8/24/83, p. 9); Ockermann (Dep., 5/23/83, p. 18)

10. *E.g.*, Lakin (Dep., 8/24/83, p. 8–9); Stowers (Dep., 5/20/83, p. 16); Woodke (Dep., 5/17/83, p. 14)

11. Mr. Cohen, at his deposition taken on September 1, 1983, stated as follows:

ever, GeoTrans' suggested the possibility of subsidence occurring as a result of Prudential's withdrawals of ground water.

There is a lack of any evidence indicating that subsidence has occurred on any of plaintiffs' land, or for that matter, anywhere in the area. None of the plaintiffs nor their experts testified as to any incident in which ground had actually subsided at all, let alone any evidence that would link such subsidence to Prudential's activities.

Plaintiffs have not proven how Prudential's withdrawals of water could have affected the physical makeup of the aquifer or the underlying geological formations in Jasper and Newton Counties. Subsidence could only occur if there was further compaction of the acquitard. The aquitard itself was formed by pressure exerted on it by a retreating glacier. The aquitard has already been fully compacted and further compaction and subsidence is simply not possible.

### C.

The burden of proving increased hydrogen sulfide claims again falls upon the plaintiffs. The lack of chemical analysis to support the claim complicates the fulfillment of that burden since the evidence is limited solely to the subjective perceptions of the plaintiffs and those perceptions, as shown by the evidence, differ from person to person. However, the feelings on this subject run very high.

The fact that a witness is emotional does not per se destroy that witness' credibility. Emotions about important subjects such as ones family and home are completely understandable and may even be noble.

The fact that a witness is not labeled as an expert does not per se undermine that witness' usefulness to the fact finder. As a matter of historical development the rules on expert testimony are exceptional. It is elementary that a court can and should give careful consideration to the testimony of lay witnesses about objective facts.

As a general proposition the plaintiffs testified truthfully about essential facts. There was some emotion and exaggeration that would create a judicial discount. Much of their testimony relates more directly to their damage claims and there remains in many instances serious problems of causative proof.

Based upon the history of the area and the random occurrence of hydrogen sulfide, plaintiffs and others who have drilled replacement wells may have in fact reached water containing hydrogen sulfide, particularly when those wells have been drilled to depths in excess of 150 feet.[12] There is an adequate damage remedy for those complaints available in this case in a later phase assuming the plaintiffs can sustain their burden of proof on all necessary elements in regard to same.

The claim that hydrogen sulfide levels increased in an existing well is supported by the subjective testimony of the plaintiffs. Such cannot be ignored and should be carefully presented and considered on the damage phase of this case. This area of proof is not the monopoly of so-called experts and even the emotional subjective complaints of the plaintiffs are entitled to a respectful hearing by the trier of fact in the damage phase later.

### D.

The alleged interconnection between the surficial and bedrock aquifers, between Prudential's irrigation and loss of soil moisture in the surficial aquifer, and the damages purportedly caused by such intercon-

---

If with respect to that [physical damage to the aquifer] again you mean a physical change in the bedrock aquifer, as far as the solid material in the bedrock aquifer, I have not investigated that. I have not seen evidence to show that that has occurred. Nor have I seen evidence to show that that has not occurred. P. 20

12. Mr. Beaver who encountered sulfur in water in his new well drilled to a depth of 180 feet with the pump set at 150 feet. (Beaver Dep. 12/14/82, p. 7)

nection, constitute another claim most difficult of proof.

Before any plaintiff could show injury based on this claim, that plaintiff would first have to show that he or she lives in an area where that is a surficial aquifer. But most of the plaintiffs who complain about this interconnection do not in fact live in an area where the surficial aquifer exists. Instead, they live on the Iroquois Moraine, an area where the acquitard reaches to the surface and accordingly, there is no surficial aquifer. The location of the Iroquois Moraine and the locations of the residences of each of the plaintiffs with respect to such Iroquois Moraine is noted on the large map prepared by Prudential and introduced as Defendant's Exhibit UU.

In the aquifer system in Jasper and Newton Counties, there is typically a lower or bedrock aquifer and a surface or sand aquifer, separated by an aquitard. The aquitard is an essentially impermeable layer of clay which acts to prohibit an interconnection between the bedrock and surficial aquifer, at least within any period of time relative to the growing season. In the Iroquois Moraine area, the aquitard extends to the surface and there is no surficial aquifer.

And GeoTrans directs its conclusions only to areas where the surficial aquifer exists. GeoTrans in its written report of September 8, 1983, stated:

> ... from examination of a wide range and several combinations of confining bed parameters, it is probable that in areas in the vicinity of a good connection *between the two aquifers* drawdowns during the growing season are experienced in the *shallow system* as a result of Prudential

pumpage. The magnitude of these drawdowns depends on the local hydrogeologic conditions.

Plaintiffs' Ex. 55.1, p. 101 (emphasis added)

Even GeoTrans does not purport to conclude that Prudential's pumping would affect surface moisture conditions in the Iroquois Moraine. Consequently, the only plaintiffs who could be injured by any connection between the bedrock and surficial aquifers are those who live in an area where the surficial aquifer exists. Only nine plaintiff families satisfy this condition. The level of proof here may be relevant on the damage phase but is insufficient for the issuance of an injunction now.

### E.

With respect to claims of lower crop yields, it is first important to note that not all of the plaintiffs make this claim. Max Stowers and Robert Lakin, the two plaintiffs who live closest to the area of zero aquitard located to the northeast of Fair Oaks Farms (the only area where plaintiffs' experts conclude there could be an interconnection between the two aquifers), do not believe their crop yields have been affected by Prudential's irrigation.[13]

Most plaintiffs, however, do not have actual crop yield data and several, for example, Ed Kosta, claim that a comparison of crop yields would be meaningless because of the different farming practices applied every year.[14]

Those plaintiffs who actually have crop yields, such as George and Joanne Kanne, are unable to show any pattern which might indicate Prudential's pumpage has affected their crop yields:

---

**13.** RN, Inc. (a company owned by the Lakin family) and Max Stowers own property closest to the area of little or no aquitard (Def.Ex.UU) and do not claim crop yield loss. Lakin (Dep., 8/24/83, p. 8–9); Stowers (Dep., 5/20/83, p. 16)

**14.** Kosta (Dep., 8/23, p. 14).

| Kanne Corn Yields (Def. Ex. MMMM) | | | | |
| Harold Kanne Farm | George Kanne Farm | Edna Mitchell Farm | Martha Lonegran Farm | Art Brinkman Farm |
|---|---|---|---|---|
| 1978 | 118 | 118 | 123 | 93 | |
| 1979 | 115 | 115 | 126 | 145 | |
| 1980 | 82 | 82 | 51 | 96 | |
| 1981 | 112 | 112 | 130 | 147 | 108 |
| 1982 | 132 | 132 | 131 | 160 | 129 |
| 1983 | 60 | 60 | 94 | 76 | 65 |

1981 and 1982, the years Prudential allegedly affected the yields, were the best years ever on the Mitchell and Lonegran farms. 1982 was the best year ever on the Kannes' own farms and 1981 was virtually the same as 1978 and 1979. Only 1983, the drought year, and 1980, a very wet year, show any marked difference.

There are two plaintiffs who meet the conditions necessary to the plaintiffs' experts' conclusions, since they live in an area where the surficial aquifer exists and near the area of thin aquitard. They are, therefore, the only two plaintiffs who could have experienced lower crop yields. But these two plaintiffs do not claim any loss of crop yields. However, at least seven plaintiffs who live on the Iroquois Moraine, an area where the plaintiffs' experts agree that there can be no interconnection between the two aquifers, because there is no surficial aquifer, do claim a loss of crop yields.[15]

The evidence on this subject does not authorize the issuance of an injunction here but may possibly be the basis for damage claims.

### F.

Plaintiffs have continually alleged and insisted that their wells have "gone dry" due to Prudential's pumping. Prudential has admitted that its pumping lowers the static water level in the wells but has maintained that these wells still contain water at artesian conditions.[16]

The only evidence indicating that any well in the area was not at all times under artesian conditions was provided by Mr. Cohen who suggested that Prudential Well P–15 was not under artesian conditions at some time during the summer of 1983. Cohen admitted that this well was on Prudential property and that he was not aware of any well which was on the Fair Oaks Farms which was not at artesian conditions.

The DNR has consistently found that no wells have gone dry. This conclusion is set forth in both their 1981 and 1982 reports. Mr. Bruns, in his direct testimony, stated that no person who took steps to meet the departmental guidelines was without water.

This claim of wells "going dry" does not present any basis for a finding for an injunction at this time. *See, Behrens v. Scharringhausen,* 22 Ill.App.2d 326, 161 N.E.2d 44 (1959) (Plaintiffs did not prove irreparable injury when they were able to obtain adequate well water by extending pipes or installing larger pumps.) This same evidence may well support some damage claims later.

### VI.

With one important exception, there has been no persuasive basis established here for either the type of temporary or permanent injunction that has now been specifically requested by the plaintiffs. (It

---

**15.** *See,* Def.Ex.UU showing the plaintiffs Summers, Ed Kosta, Callahan, Spall, Stucker, Beaver, Lane, all of whom claim lower crop yields, all live on the Iroquois Moraine.

**16.** CDM Report, Def.Ex.MMM, p. 67. The DNR agrees with this position. DNR Report, Def. Ex.AA, p. 4.

should be noted in the final briefs and during the final arguments counsel for the plaintiffs tacitly, if not more, backed away from any request for permanent injunctive relief.) It is not the intention of this court in this case to grant any permanent injunctive relief. It is the intention of the court to grant very limited and specific temporary injunctive relief and in the exercise of the court's authority and discretion to grant temporary injunctive relief to set up a monitoring system for the immediate future.

The exception referred to relates to the spraying of water on public highways (including Interstate 65) and in ditches and uncultivated areas from the endguns on the irrigation systems now in place on the Prudential real estate. Spraying water from all endguns on all of the systems that are presently located east of a north-south line created by Indiana Highway 55 is now temporarily enjoined until further order of this court. The burden is and will be on the defendant Prudential to demonstrate that *all* irrigation equipment is in realistic and not just theoretical working order so as to prevent this unneeded waste of water from the malfunctioning of the aforesaid endguns. This court is less than impressed with the conduct and attitude of Prudential, through its agents, concerning this wasteful practice. Considering that ground water has been declared by the legislative action in the State of Indiana to be both a precious and expendable resource, spraying the same on Interstate 65 involves a supreme waste of that resource. There is nothing in *Wiggins* nor in any other decision or authority in the State of Indiana for permitting the same. This court remains totally unconvinced by the weak argument of Prudential that as long as the basic purpose of agricultural irrigation is proper, then the waste of water in that process cannot be the basis for injunctive relief. Such an argument flies in the face of the composite public policy of the State of Indiana as announced by its legislature on the subject and reflects a very distasteful and disagreeably indifferent attitude by Prudential. In other areas such

as crop loss and water quality there is disputed evidence in the record that may well be sufficient to the trier of fact when the various damage claims are presented to that trier of fact in this case. However, for purpose of either permanent or temporary injunction this court determines that the evidence on crop loss and water quality with the alleged resulting impact on real estate values is not sufficiently persuasive to cause this court to grant a general or massive injunction. It should be emphasized that there is no attempt here made to determine the legal validity of the several damage claims of the plaintiffs that still pend. Those must and will be decided in future proceedings in this case. In the exercise of its continuing jurisdiction in this case and in the exercise of its discretion to formulate reasonable remedies for the immediate future and in the exercise of its authority under Rule 65 of the Federal Rules of Civil Procedure, this court has determined to appoint a duly qualified and experienced monitor whose purpose it shall be to examine and observe the amount of water extracted by these Prudential irrigation systems between July 1, 1984 and September 30, 1984. It will also be the function of the aforesaid monitor to receive, examine, evaluate and report to this court any and all complaints of any of these plaintiffs with regard to alleged excessive extraction of ground water by Prudential during the aforesaid period of time. The aforesaid monitor will be appointed by this court no later than June 1, 1984 and shall act under the authority of this court as announced in this decision. The cost of said monitoring, including the cost of the reasonable services of said monitor shall be fixed by this court but shall be borne solely by the defendant Prudential.

Courts have inherent authority to appoint nonjudicial officers to carry out judicial functions. *Powell v. Ward,* 487 F.Supp. 917, 935 (S.D.N.Y.1980), *aff'd and modified,* 643 F.2d 924 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981), citing *Ex Parte Peter-*

*son,* 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1919). See also Rule 53 F.R.C.P.

Before further proceedings are held on the damage claims, trial counsel for the parties are to meet with this court in Lafayette, Indiana, for a final pretrial and settlement conference on June 1, 1984, at 1:00 o'clock P.M.

With the aforesaid exceptions of granting a temporary injunction in regard to the discharge of water from endguns and for the appointment of a monitor to operate during the months of July, August and September of 1984, all other relief in the nature of a temporary injunction or permanent injunction as requested by the plaintiffs are now DENIED and it is further ordered that each party shall bear its own costs in this proceeding up to this point. Jurisdiction is here retained. This memorandum and order is intended to comply with Rule 52 F.R.C.P. as well as Rule 65 F.R.C.P.

It is SO ORDERED.

## APPENDIX A

9 WATER RIGHTS: EMERGENCY REGULATION 13–2–2.5–3

### CHAPTER 2.5
### WATER RIGHTS: EMERGENCY REGULATION

SECTION.
13–2–2.5–1. Need for regulation in Jasper and Newton counties.
13–2–2.5–2. Definitions.
13–2–2.5–3. On-site investigations—Declaration of emergency—Restriction on water extraction.
13–2–2.5–4. Registration of water wells.

SECTION.
13–2–2.5–5. Guidelines for wells and pumps.
13–2–2.5–6. When emergency declaration effective.
13–2–2.5–7. Exception to chapter.
13–2–2.5–8. Civil rights of action not affected.
13–2–2.5–9. Violations—Penalty.

**13–2–2.5–1. Need for regulation in Jasper and Newton counties.**—Because of the unique combination of unconsolidated glacial deposits, bedrock deposits, soil composition, natural ground water table, and the potential for irrigation with ground water associated with the counties of Jasper and Newton, it is necessary to give the director of the department of natural resources the powers described in this chapter. [IC 13–2–2.5–1, as added by Acts 1982, P.L. 102, § 1.]

**Effective Dates.** Acts 1982, P.L. 102, § 3 declared an emergency. Approved February 15, 1982.

**13–2–2.5–2. Definitions.**—As used in this chapter:

"Department" means the department of natural resources.

"Director" means the director of the department of natural resources.

"Ground water" means water that fills the natural openings under the earth's surface, including all underground streams, artesian basins, lakes, reservoirs, aquifers, and other bodies of water below the surface of the earth.

"Person" means an individual, an incorporated or unincorporated organization or association, a trustee or legal representative, or a group of such persons acting in concert. [IC 13–2–2.5–2, as added by Acts 1982, P.L. 102, § 1.]

**13–2–2.5–3. On-site investigations—Declaration of emergency—Restriction on water extraction.**—Within twenty-four [24] hours after receiving a written complaint from a householder or livestock farmer in Jasper or Newton County that a well on property in his possession has failed to furnish its normal supply of water, the director shall cause an on-site investigation to be made. If the investigation discloses:

(1) That the well fails to furnish its normal supply of water;

(2) That the failure is caused by a substantial lowering of the level of ground water in the area; and

(3) That the well and its equipment conforms to the recommended guidelines of the department issued under section 5 [13–2–2.5–5] of this chapter;

the director shall declare an emergency and restrict the quantity of water that a person may extract from any well in those counties that is capable of producing more than one hundred thousand [100,000] gallons per day. The restriction shall be expressed in gallons of water, may apply to one or more wells in all or a part of the two [2] counties, and may be broadened or narrowed as appropriate. The restriction shall be lifted as soon as justified by changed conditions. [IC 13–2–2.5–3, as added by Acts 1982, P.L. 102, § 1.]

**13–2–2.5–4. Registration of water wells.**—Every person in Jasper or Newton County possessed of land that contains a water well on his land that is capable of producing more than one hundred thousand [100,000] gallons of water per day shall register that well and all like wells with the department and shall furnish such reasonable data in such form as may be required by the department. [IC 13–2–2.5–4, as added by Acts 1982, P.L. 102, § 1.]

**13–2–2.5–5. Guidelines for wells and pumps.**—The department shall issue recommended guidelines for the construction of wells and the type and setting of pumps for use in those wells. Copies of the guidelines shall be made available from the department on request. [IC 13–2–2.5–5, as added by Acts 1982, P.L. 102, § 1.]

**Compiler's Notes.** Acts 1982, P.L. 102, § 2 provides: "The guidelines required by IC 13–2–2.5–5, as added by section 1 of this act, shall be issued within sixty days after the effective date of this act [February 15, 1982]."

**13–2–2.5–6. When emergency declaration effective.**—A declaration of an emergency under this chapter is effective as to a particular well when copies of the declaration are:

(1) Given to the newspapers and radio stations located in the affected county; and

(2) Delivered to an address in one [1] of those counties specified by each person affected who has registered the affected well under this chapter. [IC 13–2–2.5–6, as added by Acts 1982, P.L. 102, § 1.]

**13–2–2.5–7. Exception to chapter.**—This chapter does not apply to the state or to a political subdivision as defined by IC 36–1–2–13. [IC 13–2–2.5–7, as added by Acts 1982, P.L. 102, § 1.]

**13–2–2.5–8. Civil rights of action not affected.**—This chapter neither creates anew or abridges an existing civil right of action. [IC 13–2–2.5–8, as added by Acts 1982, P.L. 102, § 1.]

**13–2–2.5–9. Violations—Penalty.**—A person who violates section 4 [13–2–2.5–4] of this chapter, or a restricted use of water imposed under section 3 [13–2–2.5–3] of this chapter, commits a class B infraction. [IC 13–2–2.5–9, as added by Acts 1982, P.L. 102, § 1.]

**Cross References.** Penalties for infractions, 35–50–1–1—35–50–1–4, 35–50–4–1—35–50–4–4, 35–50–5–2.

## APPENDIX B

## CHAPTER 6.1

### WATER RESOURCE MANAGEMENT

SECTION.
13–2–6.1–1. Definitions.
13–2–6.1–2. Administration by natural resources commission—Technical secretary—Advisory council—Assistance of department of natural resources.
13–2–6.1–3. Duties of commission.
13–2–6.1–4. Powers of commission.
13–2–6.1–5. Duty to maintain inventory of state water resources and plans and recommendations for development.

SECTION.
13–2–6.1–6. Determination of minimum flows of streams and minimum safe level of ground water in aquifers.
13–2–6.1–7. Registration of significant water withdrawal facilities—Forms—Verified annual reports.
13–2–6.1–8. Oversight by natural resources advisory committee.
13–2–6.1–9. Violations—Penalty.

**13-2-6.1-1. Definitions.**—As used in this chapter:

"Aquifer" means an underground geologic formation, consolidated or unconsolidated, that has the ability to receive, store, and transmit water in amounts sufficient for the satisfaction of any beneficial use.

"Beneficial use" means the use of water for any useful and productive purpose and includes, but is not limited to, domestic, <u>agricultural (including irrigation)</u>, industrial, commercial, power generation, energy conversion, public water supply, waste assimilation, navigation, fish and wildlife, and recreational uses.

"Commission" means the natural resources commission.

"Department" means the department of natural resources.

"Ground water" means all water occurring beneath the surface of the ground regardless of location and form.

"Instream use" means any use of water that utilizes surface water in place. Instream uses include, but are not limited to, commercial and recreational navigation, hydroelectric power generation, waste assimilation, fish and wildlife habitat, general recreation, and the maintenance of environmental and aesthetic values.

"Person" means an individual, an incorporated or unincorporated organization or association, a trustee or legal representative, the state, a political subdivision of the state, the United States of America, an agency of the state, or a political subdivision of the state, or of the United States of America, or a group of such persons acting in concert.

"Reasonable-beneficial use" means the use of water for a beneficial use in such quantity and manner as is necessary for economic and efficient utilization and is both reasonable and consistent with the public interest.

"Significant water withdrawal facility" means the water withdrawal facilities of a person that, in the aggregate from all sources and by all methods, has the capability of withdrawing more than one hundred thousand [100,000] gallons of ground water, surface water, or ground and surface water combined in one [1] day; however, this does not include water withdrawal facilities located in or on an off-stream impoundment that is principally supplied by a significant water withdrawal facility.

"Stream" means any natural or altered river, creek, slough, or watercourse, or artificial channel, having definable banks and bed capable of conducting defined runoff, having visible evidence of the flow or occurrence of water, and having a watershed greater than one square mile in area.

"Surface water" means all water occurring on the surface of the ground, including water in a stream, natural and artificial lakes, ponds, swales, marshes, and diffused surface water.

"Surplus water" means that water found to be in excess of existing uses and reasonably foreseeable needs in the watershed of origin.

"Withdrawal use of water" means any use of water that involves the physical removal of the water from a ground or surface source, including that from storage in an impoundment.

"Water resource" means all water on or beneath the surface of the ground or in the atmosphere, including streams, impoundments, diffused surface water, and water percolating, standing, or flowing beneath the surface of the ground, as well as all boundary and coastal waters within the jurisdiction of the state. [IC 13-2-6.1-1, as added by P.L.164-1983, § 1.]

**Effective Dates.** P.L.164-1983, § 2(a) provides that except as provided in subsection (b), this chapter takes effect January 1, 1984. Subsection (b) of § 2 provides that IC 13-2-6.1-7 and IC 13-2-6.1-9 take effect July 1, 1984.

**13-2-6.1-2. Administration by natural resources commission—Technical secretary—Advisory council—Assistance of department of natural resources.**—(a) The natural resources commission shall administer this chapter.

(b) The deputy director for water and mineral resources of the department of natural resources shall serve as technical secretary to the commission. He shall perform such duties as are required by this chapter or as the commission directs.

(c) The advisory council for water and mineral resources of the department of natural resources shall serve in an advisory capacity to the commission with respect to the implementation of the commission's powers and duties, including the drafting of rules and development of inventories, assessments, and plans.

(d) For such times as the advisory council is involved in the drafting of rules, its membership shall be augmented as follows:

(1) Two [2] members of the senate, no more than one of whom shall be of the same political party, to be appointed for a term of two [2] years by the president pro tempore of the senate.

(2) Two [2] members of the house of representatives, no more than one of whom shall be of the same political party, to be appointed for a term of two [2] years by the speaker of the house.

These members shall be entitled to travel expenses and a per diem allowance as determined by the state budget agency for members of boards and commissions generally.

(e) The department of natural resources shall provide professional, technical and clerical personnel, equipment, supplies, and support services reasonably required to assist the commission in the exercise of its powers and duties under this chapter. Funds for this purpose shall be included in the regular operating budget requests of the department. [IC 13–2–6.1–2, as added by P.L.164–1983, § 1.]

**13–2–6.1–3. Duties of commission.**—The commission shall:

(1) Conduct a continuing assessment of the availability of the water resource;

(2) Take and maintain an inventory of significant uses of water withdrawn from the surface or ground; and

(3) Plan for the development, conservation, and utilization of the water resource for beneficial uses. [IC 13–2–6.1–3, as added by P.L.164–1983, § 1.]

**13–2–6.1–4. Powers of commission.**—The commission may:

(1) Collect and disseminate information relating to the water resource;

(2) Consult with and advise all users of the water resource as to availability of the water resource and the most practical method of water withdrawal, development, conservation, and utilization;

(3) Make the necessary investigations and inspections for proper administration of this chapter;

(4) Enter at reasonable times with proper notice upon any property other than a dwelling place for the purpose of inspecting and investigating significant water withdrawal facilities or enforcing the provisions of this chapter;

(5) Establish, by rule, the criteria for the determination of minimum stream flows and minimum ground water levels;

(6) When necessary for the proper administration and enforcement of this chapter, require the metering or other reasonable measurement of water withdrawals from significant water withdrawal facilities and the reporting thereof to the commission;

(7) Cooperate with other state and local agencies, other states and their state agencies, and agencies of the United States in water resource development, conservation, and utilization;

(8) Accept and administer funds from any source to aid in carrying out the provisions of this chapter; and

(9) Exercise such additional authority as may be necessary to carry out the provisions of this chapter. [IC 13–2–6.1–4, as added by P.L.164–1983, § 1.]

**13–2–6.1–5. Duty to maintain inventory of state water resources and plans and recommendations for development.**—(a) The commission shall make and maintain an inventory of the water resource of the state. The inventory shall include an assessment of:

(1) The capabilities of streams to support instream and withdrawal uses and of aquifers to support withdrawal uses;

(2) Low stream flow characteristics;

(3) Existing uses and projections of beneficial use requirements;

(4) The potential in watersheds for managing flood water for beneficial uses;

(5) Potential sources, and amounts of, surplus water available for transfers; and

(6) Such other assessment and information as may be deemed necessary to properly define water resource availability.

(b) The commission shall maintain, on a continuing basis and with opportunity for participation and consultation with all interested persons, plans and recommendations for the development, conservation, and utilization of the water resource to best serve the needs of the people of Indiana for beneficial uses. [IC 13–2–6.1–5, as added by P.L.164–1983, § 1.]

**13–2–6.1–6. Determination of minimum flows of streams and minimum safe level of ground water in aquifers.**—(a) The commission may determine and establish the minimum flows of streams, taking into account the varying low flow characteristics of the streams of the state and the importance of instream and withdrawal uses, including established water quality standards and public water supply needs.

(b) The established minimum flows of streams shall be those naturally occurring, as determined by the commission, and may be calculated to reflect seasonal and regional variations; however, in the

case of boundary waters, the commission may develop mutually agreeable minimum flows of streams in cooperation with the boundary state.

(c) The commission may determine and establish the minimum level of ground water in aquifers below which further withdrawals would be significantly harmful to the water resource of the area. [IC 13–2–6.1, as added by P.L.164–1983, § 1.]

**13–2–6.1–7. Registration of significant water withdrawal facilities—Forms—Verified annual reports [effective July 1, 1984].**—(a) Every person who has a significant water withdrawal facility shall register it with the commission on forms provided by the commission that contain the:

(1) Name and legal address of the registrant;

(2) Source of water supply;

(3) Total capability of the water withdrawal facility;

(4) Total withdrawal capability per day and the amount from each source;

(5) Use to be made of the water, the place of use, and the place of discharge;

(6) Geographic location of the supply source;

(7) Date of registration; and

(8) Such other information specified by rule.

(b) All significant water withdrawal facilities completed by July 1, 1984, must be registered before January 1, 1985.

(c) All significant water withdrawal facilities that are completed after July 1, 1984, must be registered within three [3] months after the facility is completed.

(d) The owner of every registered significant water withdrawal facility shall, within three [3] months after the end of each calendar year, make a verified report to the commission, on forms to be provided by the commission, of the amounts of water withdrawn during that calendar year. [IC 13–2–6.1–7, as added by P.L.164–1983, § 1.]

**Effective Dates.** P.L.164–1983, § 2(b). July 1, 1984.

**13–2–6.1–8. Oversight by natural resources advisory committee.**—The natural resources advisory committee created by IC 2–5–5–1 shall oversee the water resource management program of this chapter and the needs of the people of Indiana and shall from time to time report its findings and recommendations thereon to the general assembly through the legislative council. [IC 13–2–6.1–8, as added by P.L.164–1983, § 1.]

**13–2–6.1–9. Violations—Penalty [effective July 1, 1984].**—A person who violates section 7 [13–2–6.1–7] of this chapter commits a class B infraction. A separate infraction is committed each day such a violation occurs. [IC 13–2–6.1–9, as added by P.L.164–1983, § 1.]

**Effective Dates.** P.L.164–1983, § 2(b). July 1, 1984.

**Cross References.** Infraction and ordinance violation enforcement proceedings, 34–4–32–1—34–4–32–5.